RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0001p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re:  LINDA S. COOK

No. 08-3026

_____

Appeal from the United States District Court

for the Northern District of Ohio at Cleveland.

No. 03-00002—James G. Carr, Chief District Judge.

Argued:  October 30, 2008

Decided and Filed:  January 6, 2009

Before:  CLAY, GILMAN, and ROGERS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Robert H. Golden, GOLDEN AND KUNZ, P.C., Lathrup Village, Michigan, for Appellant.  **ON BRIEF:**  Robert H. Golden, GOLDEN AND KUNZ, P.C., Lathrup Village, Michigan, for Appellant.

CLAY, J., delivered the opinion of the court in which, GILMAN, J., joined. ROGERS, J. (p. 19), delivered a separate concurring opinion.

_____

**OPINION**

_____

CLAY, Circuit Judge.  Linda S. Cook appeals from an order of disbarment entered against her by the United States District Court for the Northern District of Ohio.  Cook's disbarment by the district court follows on the heels of her Ohio state disbarment.  On appeal, Cook raises two fundamental claims:  (1) that the Ohio courts denied her due process

1

during her state disbarment proceedings; and (2) that these due process violations in her state disbarment proceedings tainted the district court's proceedings.

As to Cook's first claim, this Court lacks jurisdiction to consider directly whether Cook's state disbarment proceedings violated her due process rights. Moreover, even if we could consider the issue, Cook's claim fails on the merits. As to the second issue, we find nothing in the record to support Cook's claim. Therefore, we affirm the district court's order permanently disbarring Cook from the practice of law before the United States District Court for the Northern District of Ohio.

**I.**

The Supreme Court of Ohio disbarred Cook on July 11, 2007. On December 10, 2007, the district court followed suit. The Supreme Court of Ohio and the district court disbarred Cook based on the same set of facts.

Prior to her disbarment, Cook was an attorney engaged primarily in estate and Medicaid planning in Ohio and Michigan. Sometime in 2000, Cook was engaged to prepare several estate documents for an elderly client, Esther Benfer, including: (1) a revocable living trust agreement; (2) a last will and testament; (3) a comprehensive durable power of attorney; (4) a durable special power of attorney; (5) an assignment of tangible personal property; and (6) a quit-claim deed for a parcel of property owned by Ms. Benfer (the "Benfer Farm"). The documents prepared by Cook contained the following features: (1) the revocable living trust agreement named Cook as co-trustee along with Ms. Benfer; (2) the last will and testament named Cook as the personal representative of the will; (3) the comprehensive durable power of attorney named Cook as the responsible agent; (4) the durable special power of attorney named Cook as attorney-in-fact; and (5) the assignment of tangible personal property assigned Ms. Benfer's property to the Esther J. Benfer Living Trust and named Cook as the trustee. Despite these features, Cook did not advise Ms. Benfer that she should secure independent and disinterested advice from other counsel before signing any of these documents. Other than the quit-claim deed, all of these documents were dated June 8, 2001.

As to the quit-claim deed, the story is more complicated. Although the quit-claim deed prepared by Cook was dated May 20, 1998, it was recorded in the Fulton County Recorder's Office on July 12, 2001. The deed transferred the Benfer Farm to Cook as "Trustee." Shortly after the deed was recorded, Cook altered the deed by crossing out the word "Trustee" and inserting the word "Married." The altered deed was recorded on September 10, 2001. Around this time, Cook also prepared another quit-claim deed transferring Cook's personal title to the Benfer Farm to the Metamora United Methodist Church. Although this third deed was dated December 25, 2000, it was not recorded until December 13, 2001.

Cook acknowledges that the May 20, 1998 date on the original deed was inaccurate, but argues that the backdating was unintentional. According to Cook, she directed someone on her staff to prepare the deed and other documents. Once the documents were prepared, Cook claims that she reviewed them for errors and made notations regarding necessary revisions for her staff to make. Cook then scheduled an appointment to have Ms. Benfer come into Cook's office to review and sign the documents. Before the scheduled appointment, however, Cook claims that Ms. Benfer telephoned Cook to ask if Ms. Benfer could come into Cook's office on an earlier date to sign the deed. Although Cook was not going to be in the office that day, she informed Ms. Benfer that someone on her staff would present the necessary documents for signing. Cook "surmise[s]" that, when Ms. Benfer came into the office, Cook's staff must have been unable to locate the deed, and, in an attempt to cover up the mistake, someone on her staff used a deed previously prepared for another client as a template to create a new deed for Ms. Benfer. According to Cook, her staff must have overlooked the 1998 date, and also mistakenly listed Cook as a trustee.

Cook claims that she corrected the allegedly clerical error listing her as a trustee as soon as she became aware of it, but insists that she did not notice at that time that the date on the deed also was mistaken. In fact, Cook asserts that she first learned of the dating error when she received notice of the Toledo Bar Association's disciplinary complaint against her in April of 2005.

The record casts serious doubt on Cook's story. Most notably, the significance of backdating the deed to May 20, 1998 raises serious questions regarding the credibility of

Cook's assertion that the error resulted from a simple and unintentional clerical oversight by her staff. When Ms. Benfer first engaged Cook's services, Ms. Benfer expressed her desire to leave her farm as a gift to the United Methodist Church. Cook was concerned, however, that transferring the property to the Church would jeopardize Ms. Benfer's eligibility for Medicaid benefits because the value of the property would be included in Ms. Benfer's Medicaid eligibility determination should she need to move to an assisted living facility. *See* 42 U.S.C. § 1396p(c)(1) (providing that the transfer of non-exempt "assets," such as an applicant's home, for less than fair market value within the required "look-back" period renders the applicant ineligible for assistance). Medicaid eligibility determinations require a five-year "look-back" period for assets transferred to a trust, but only a three-year "look-back" period for assets transferred to an individual. *Id.* at § 1396p(c)(1)(B)(i). Consequently, because the Benfer Trust was established on June 8, 2001, any assets not divested to an individual before at least *June 8, 1998* potentially would count against Ms. Benfer's Medicaid eligibility. In this context, if the backdating was an honest mistake, it seems a remarkable coincidence that the *May 20, 1998* date, when taken together with the fact that the altered deed transferred the Benfer Farm to Cook as an individual rather than a trustee, effectively removed the value of the property from Ms. Benfer's Medicaid eligibility determination.

Furthermore, because Cook ultimately transferred her *personal* title to the Benfer Farm to the United Methodist Church, Cook became eligible for significant income tax deductions based on her donation of the property to a qualified charitable organization.[1] *See* 26 U.S.C. § 170(b)(1)(A)(i). Taking full advantage of that benefit, Cook took a $56,804 deduction on her 2000 income tax return.[2] Indeed, all told, Cook took nearly $225,000

---

[1] To be eligible for a § 170 gift deduction, the charitable transfer must be made to a qualified recipient, within the taxable year, and consist of cash or qualified property, not exceeding a specified percentage of the taxpayer's income in the year of payment or (where a carryover is permitted) in subsequent years. 26 U.S.C. §§ 170(a)-(h).

[2] Cook does not deny that she took these deductions, but does deny that they were improper, arguing that they were not based on a "sham" transaction. Cook also contends that availing herself of these deductions was justified because Ms. Benfer would not have been eligible for the deductions based on her income.

in income tax deductions from 2000 to 2004, all based ostensibly on her donation of the Benfer Farm to the Church.[3]

The record also reveals several other inconsistencies with Cook's account. First, at least one person on Cook's staff testified at Cook's August 2006 state disbarment hearing that she remembered Cook's discussing the dating "error" with the staff at a meeting in 2001. Second, Cook's 2000 income tax return stated that she received title to the Benfer Farm in 1997. Third, in an attempt to protect her decision to avail herself of the available tax deduction, Cook prepared a typewritten note signed by Ms. Benfer and dated August 30, 2001 that states: "I, Esther Benfer, give Linda S. Cook permission to write off on her income tax return the gift of real property that I gave her in 1998 and she gave to the Metamora United Methodist Church on December 25, 2000." Fourth, in a sworn letter responding to the initial disciplinary inquiry letter from the Toledo Bar Association, Cook maintained that the 1998 date on the original deed was correct. Taken together, these inconsistencies cast grave doubt on the credibility of Cook's story.

Cook's subsequent actions also played a role in her disbarment. Nearly three years after Cook transferred title to the Benfer Farm to the Church, Attorney Jeffrey L. Robinson wrote a letter to Cook advising her that he now represented Ms. Benfer. The letter directed Cook to refrain from communicating with Ms. Benfer, and included a letter signed by Ms. Benfer revoking Cook's power of attorney. The letter also inquired as to the status of Ms. Benfer's tangible personal property, alleging that Cook improperly had taken Ms. Benfer's belongings, and notifying Cook that Ms. Benfer wanted her personal property returned. The letter was hand delivered to Cook on April 20, 2004.

Disregarding the letter from Mr. Robinson, Cook drafted that same day a "Petition for Appointment of Guardian of Incapacitated Individual." The petition requested that Cook be appointed Ms. Benfer's guardian, and stated that Cook was acting as Ms. Benfer's "Attorney and Power of Attorney." In support of her request,

---

[3]Under certain circumstances, an individual is permitted to carry over for up to five years the value of the gift that exceeds the deduction permitted for a single year. 26 U.S.C. § 170(b)(1)(B)(ii).

Cook stated in the petition that Ms. Benfer "lack[ed] sufficient understanding or capacity to make or communicate informed decisions due to . . . physical illness or disability."[4]

Apparently unconcerned by the fact that she had just filed a petition stating that Ms. Benfer lacked sufficient capacity to make informed decisions, the next day, Cook drafted and had Ms. Benfer sign a durable general power of attorney. Once again, Cook failed to advise Ms. Benfer that she should secure independent and disinterested advice from other counsel before singing this document.

In 2004, after receiving a letter of grievance from Mr. Robinson regarding Cook's conduct, the Toledo Bar Association initiated an inquiry into the matter by sending Cook an inquiry letter asking her to explain her conduct. In response to that letter, Cook maintained that she had not engaged in any misconduct, and claimed that she in fact had received title to the Benfer Farm in 1998.

Unsatisfied with Cook's explanations, the Toledo Bar Association initiated disbarment proceedings against Cook by filing a complaint with the Supreme Court of Ohio's Board of Commissioners on Grievances and Discipline on April 18, 2005. An amended complaint was filed on September 13, 2005. The amended complaint included two counts of alleged violations of the Ohio Bar Association's Disciplinary Rules, and detailed the factual basis for those allegations.

On August 17 and 18, 2006, a panel of the Board of Commissioners on Grievances and Discipline ("Hearing Panel") held a hearing regarding the allegations contained in the complaint. During that proceeding, the Hearing Panel heard testimony and accepted evidence relevant to the complaint. At all times during the hearing, Cook was represented by counsel. Counsel for Cook cross-examined witnesses, moved documents into evidence, and made objections throughout the hearing. The Hearing Panel also permitted Cook to present witnesses and evidence in her defense, as well as to testify at length on her own behalf.

---

[4]Testimony elicited from Cook's staff during Cook's state disbarment hearing casts serious doubt on Cook's claim that Ms. Benfer was incapacitated at the time.

Upon conclusion of that proceeding, the Hearing Panel made findings and recommendations that ultimately were adopted by the full Board.  The Board then recommended to the Supreme Court of Ohio that Cook be permanently disbarred from the practice of law before the courts of the State of Ohio.  By order dated July 11, 2007, the Supreme Court of Ohio adopted the findings and conclusions of the Board, and ordered that Cook be permanently disbarred.

On July 24, 2007, the district court issued a letter to Cook to show cause by August 1, 2007 why disbarment was not warranted.  On November 13, 2007, Cook appeared before the district court's Committee on Complaints and Policy Compliance. The record of that proceeding confirms that Cook was represented by counsel, and that Cook's counsel offered argument and responded to questions posed by the Committee. Cook also responded directly to questions from the Committee.  After the hearing, and upon consideration of the record developed in Cook's state court proceedings, the district court ordered that Cook be permanently disbarred from the practice of law before the Northern District of Ohio.  *In re Cook*, No. 03 AT 0002 (N.D. Ohio Dec. 10, 2007). This appeal followed.

## II.

On appeal, Cook devotes a substantial portion of her argument to challenging the sufficiency of the due process protections she was afforded in her state disbarment proceedings, seemingly challenging the validity of the Supreme Court of Ohio's disbarment order.  However, this Court is precluded by the *Rooker-Feldman* doctrine from reviewing any claims that challenge the sufficiency of the proceedings afforded Cook by the State of Ohio, as opposed to the process afforded Cook in her federal disbarment proceedings.

The *Rooker-Feldman* doctrine[5] embodies the notion that appellate review of state court decisions and the validity of state judicial proceedings is limited to the Supreme

---

[5]The *Rooker-Feldman* doctrine takes it name from *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

Court under 28 U.S.C. § 1257, and thus that federal district courts lack jurisdiction to review such matters. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005) ("[T]his Court's appellate jurisdiction over state-court judgments . . . precludes a United States district court from exercising subject-matter jurisdiction."); *Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008) ("The *Rooker-Feldman* doctrine is based on the negative inference that, if appellate court review of such state judgments is vested in the Supreme Court, then it follows that such review may not be had in the lower federal courts."). The *Rooker-Feldman* doctrine applies in those circumstances where a party initiates an action in federal district court "complaining of an injury *caused by* the state-court judgment and seeking review and rejection of that judgment." *Exxon Mobil*, 544 U.S. at 291 (emphasis added). The pertinent question in determining whether a federal district court is precluded under the *Rooker-Feldman* doctrine from exercising subject-matter jurisdiction over a claim "is whether the 'source of the injury' upon which plaintiff bases his federal claim is the state court judgment." *Lawrence*, 531 F.3d at 368 (quoting *McCormick v. Braverman*, 451 F.3d 382, 394 (6th Cir. 2006)). This is true regardless of whether the party challenges the validity of the state court judgment on constitutional grounds. *See Lawrence*, 531 F.3d at 369.

In light of the nature of many of Cook's claims, the *Rooker-Feldman* doctrine applies here and precludes review of any claims arising directly out of Cook's state disbarment proceedings or the Ohio Supreme Court's disbarment order. *See Saier v. State Bar of Michigan*, 293 F.2d 756, 759 (6th Cir. 1961) (federal courts do not sit in review of state bar disciplinary proceedings). The proper forum in which to raise such claims was on direct appeal to the Supreme Court of the United States. *See* 28 U.S.C. § 1257. Cook cannot seek collateral review of her state disbarment proceedings in federal court.

**III.**

Although we are precluded from reviewing directly Ohio's decision to disbar Cook, because the district court relied on the record developed by the state courts, this Court must consider whether alleged defects in those proceedings "so infected [the]

federal proceeding that justice requires reversal of the federal determination."**6** *In re Ruffalo*, 390 U.S. 544, 552-53 (1968) (White, J., concurring). *See Lawrence*, 531 F.3d at 369.

Attorney disciplinary proceedings are not civil actions and not criminal prosecutions. Nevertheless, disbarment involves "adversary proceedings of a quasi-criminal nature." *Ruffalo*, 390 U.S. at 551. An attorney facing disbarment thus is "entitled to procedural due process, which includes fair notice of the charge." *Id.* at 550. In addition, courts must provide "ample opportunity . . . to show cause why an accused practitioner should not be disbarred." *Theard v. United States*, 354 U.S. 278, 282 (1957).

Because the requirements for admission and continued practice in federal and states courts are distinct, federal courts are not conclusively bound by state disbarment orders. *Theard*, 354 U.S. at 282 ("[D]isbarment by federal courts does not automatically flow from disbarment by state courts."); *In re Crow*, 359 U.S. 1007, 1008 (1959) (Douglas, J., dissenting) ("State proceedings of disbarment, though presumptively correct, are not binding." (citing *Selling*, 243 U.S. at 46)). This is true even though admission to practice before a federal court is conditioned upon admission to practice before a state court. *Ruffalo*, 390 U.S. at 547 ("Though admission to practice before a federal court is derivative from membership in a state bar, disbarment by the State does not result in automatic disbarment by the federal court. Though that state action is entitled to respect, it is not conclusively binding on the federal courts."); *Theard*, 354 U.S. at 281 ("While a lawyer is admitted into a federal court by way of a state court, he is not automatically sent out of the federal court by the same route."); *Saier*, 293 F.2d at 759 (same).

---

**6**In *Ruffalo*, the Supreme Court reversed a disbarment order entered by the Sixth Circuit on the ground that the Ohio Board of Commissioners on Grievances and Discipline failed to provide fair notice of the charges leveled against the attorney. 390 U.S. at 551. The Supreme Court reviewed the state proceedings only after noting that the Court of Appeals relied exclusively on the record developed by the Ohio courts rather than conducting its own hearing. *Id.* at 549. Consequently, as the Court noted, "[i]f there are any constitutional defects in what the Ohio court did concerning [the charge at issue], those defects are reflected in what the Court of Appeals decided." *Id.* at 550.

Nevertheless, a disbarment order handed down by a state court is entitled to due respect. *Theard*, 354 U.S. at 282 (state court disbarment determinations are entitled to "high respect"); *In re Selling*, 243 U.S. 46, 50 (1917) (disbarment of an attorney by a state court found to "absolutely destroy the condition of fair private and professional character, without the possession of which there could be no possible right to continue to be a member of this Bar"). Federal courts also have noted that there are sound practical reasons for deferring to state judgments in this context, explaining that "state bars are much larger than federal bars, and with size has come the development of the means to investigate charges of misconduct and resolve factual disputes." *In re Cook*, 49 F.3d 263, 265 (7th Cir. 1995). Moreover, "the state bar has the superior perspective" of the attorney's history of conduct and professionalism. *Id.*

In view of the respect and practical deference afforded to state court judgments, federal courts may initiate a disciplinary inquiry and even disbarment proceedings based solely on an attorney's disbarment by a state court. *See* Fed. R. App. P. 46(b)(1)(A). *See also Theard*, 354 U.S. at 282 (noting that the federal disbarment proceedings may be initiated where the "accusation rests [solely] on disbarment by a state court"). Indeed, the Supreme Court held in *Selling* that federal courts should proceed on the presumption that federal courts "should recognize the condition created by the judgment of the state court" unless certain factors are present, including:

> 1. That the state procedure from want of notice or opportunity to be heard was wanting in due process; 2, that there was such an infirmity of proof as to facts found to have established the want of fair private and professional character as to give rise to a clear conviction on our part that we could not consistently with our duty accept as final the conclusion on that subject; or 3, that some other grave reason existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the conviction that, under the principles of right and justice, we were constrained so to do.

243 U.S. at 51. Thus, federal courts may give considerable weight to the findings and conclusion of the state courts in such disciplinary matters, but it is ultimately the

responsibility of the federal courts to determine whether a member of the federal bar is fit to practice in federal court.

With this framework in mind, we conclude that the record does not support Cook's claim that any alleged shortcomings in her state proceedings somehow undermined the legitimacy or fairness of her federal proceedings. Put another way, none of the factors identified in *Selling* that would preclude the district court from relying on the findings of the state courts is present here.

## A. Due Process

First, Cook fails to show that her state proceedings deprived her of due process. Cook initially was apprised of this matter in 2005 when she received an inquiry letter from the Toledo Bar Association. In responding to that letter, Cook was afforded her first opportunity to explain her version of events and to justify her conduct. Cook availed herself of that opportunity. Unsatisfied with her response, the Toledo Bar Association filed a complaint with Ohio's Board of Commissioners on Grievances and Discipline. That complaint set forth fully the charges against Cook, identified the conduct at issue, and specified the Ohio Disciplinary Rules on which the charges rested. During a two-day hearing, Cook was afforded an opportunity to respond to the allegations set forth in the complaint, testify at length in her own defense, and present other witnesses and evidence to support her version of events. Cook also was able to make objections to the Hearing Panel's findings and recommendations. At each step, Cook was fully aware of the charges against her and the basis on which those charges were made, and she was afforded ample opportunity to respond to those allegations.

Despite this clear record, Cook alleges three specific defects with her state proceedings: (1) that the Ohio courts required her to express remorse prior to any consideration of the merits of the charges, which Cook claims put her in an impossible position because she maintains that she did nothing wrong; (2) that there was no testimonial evidence to support the Hearing Panel's conclusions; and (3) that the Supreme Court of Ohio's decision not to hold a hearing on her objections to the Board's

recommendations deprived her of due process. We conclude that all of Cook's contentions are without merit.

## 1. Remorse

Cook asserts that the state disbarment proceedings deprived her of due process because the Hearing Panel and the Supreme Court of Ohio required that she express remorse *prior* to any consideration of the merits of the charges. Cook argues that the Ohio courts should have bifurcated the disbarment proceedings, and considered the merits of the misconduct charges and the remorse/mitigation issues separately.

As an initial matter, there is nothing to suggest that Cook's lack of remorse—or the weight given that fact by the Ohio courts—played any role in the district court's decision to disbar Cook. That is to say that whatever weight was given to Cook's lack of remorse by the Ohio courts did not "so infect" Cook's federal proceedings as to render them fundamentally unfair. *See Ruffalo*, 390 U.S. at 553 (White, J., concurring).

In any event, contrary to Cook's assertion, the record plainly shows that Cook's lack of remorse was considered by the Ohio courts only in terms of determining the appropriate punishment. In a section of findings expressly titled "Mitigation," the Hearing Panel concludes that Cook "failed or refused to acknowledge any wrongful conduct on her part." Similarly, the Supreme Court of Ohio noted Cook's lack of remorse only in concluding that "no mitigating evidence warrants our lenience." In other words, the Hearing Panel and the Supreme Court of Ohio considered Cook's lack of remorse only *after* consideration of the merits of the charges against her, and only as a potentially mitigating or aggravating factor.

Due process is not implicated by the consideration of a defendant's lack of remorse as an aggravating factor. It is well established that a defendant's remorse—or lack thereof—is an appropriate consideration in meting out punishment. *See United States v. Conatser*, 514 F.3d 508, 527 (6th Cir. 2008) (approving district court's consideration of defendant's remorse during sentencing); *United States v. Baker*, 502 F.3d 465, 468-69 (6th Cir. 2007) (approving consideration of defendant's stated remorse

in imposing reduced sentence).  Indeed, the Supreme Court has specifically recognized that remorse is relevant in attorney disciplinary proceedings.  *McKune v. Lile*, 536 U.S. 24, 40 (2002) (noting that whether an attorney has "expressed contrition" is "often given dispositive weight by this Court itself on routine motions for reinstatement").  Because the state proceedings took notice of Cook's lack of remorse only as a potentially aggravating factor, Cook's due process claim in this regard has no merit.

## 2.  Lack of Supporting Testimony

Cook also asserts that the Hearing Panel and the Ohio Supreme Court lacked a proper basis for drawing inferences concerning her allegedly improper motives for backdating and making subsequent alterations to the deed because she was the only one to testify as to that issue.  Cook asserts that there was no other testimonial evidence to support the conclusion that the documents in question were intentionally backdated.  In other words, Cook challenges whether it was proper for the Hearing Panel to make negative inferences regarding Cook's motives where there was no testimonial evidence to support such inferences.  Cook argues that this raises constitutional due process concerns because, absent any testimonial evidence on this point, the Ohio courts improperly shifted the burden to her to prove that she was innocent of the charged misconduct.

As an initial matter, this is precisely the type of issue that extends well beyond the scope of review permitted under *Ruffalo*, and thus runs afoul of the *Rooker-Feldman* doctrine.  As a result, we cannot consider the argument as presented.  As explained, we can only consider whether Cook's federal proceedings were tainted by any alleged shortcomings in her state proceedings.  Recast in that light, we conclude that Cook's argument fails for several reasons.

Initially, there is no support for the notion that the alleged burden-shifting, even if true, raises due process concerns.  Cook wrongly assumes that the Toledo Bar Association, as the moving party, should bear the burden of proof in disbarment proceedings.  Because disbarment proceedings are only quasi-judicial in nature, courts have found no problem with an inquiry process that places the burden of proof on the

responding attorney. *See Ruffalo*, 390 U.S. at 551. Indeed, it is precisely this assumption that underlies the Supreme Court's approval of the "show cause" process employed by federal courts in these circumstances, not to mention the Supreme Court's explicit holdings that federal courts should defer to the state court's disbarment decision. *Selling*, 243 U.S. at 51-52. In other words, because disbarment proceedings are only quasi-judicial, there is no basis for assuming that the allocation of the ultimate burden must lie with the state. Cook has identified no case law to the contrary. In fact, as in the case *sub judice*, because there is not a moving or complaining party, the entire burden to *show cause* why disbarment is not warranted rests on Cook.

In any event, there is no merit to Cook's claim. Cook's assertion that the state courts lacked "any" basis for making findings of fact that were contrary to her testimony is contradicted by the record. First, the documentary evidence introduced at the state hearing, even standing alone, provided substantial evidence of Cook's misconduct. For instance, the original deed demonstrates that Cook transferred title of the Benfer Farm to herself and backdated the original deed. Even without further testimonial evidence, the documentary evidence alone is sufficient to support an inference that Cook intentionally backdated the deed. No further testimony is needed to support the inference that Cook's alleged clerical error story is unbelievable. Standing alone, the documents introduced at the state hearing demonstrate that Cook's conduct constitutes self-dealing in violation of Rule 1.7(a)(2) of Ohio's Rules of Professional Conduct.[7] Likewise, the fact that Cook filed a petition for guardianship the same day that she received a demand letter from Ms. Benfer's new attorney speaks volumes about her motive. No further testimony is necessary to conclude that Cook acted improperly and in violation of Rule 8.4(c)[8] and Rule 8.4(h).[9] Cook's assertion that courts cannot draw

---

[7]Rule 1.7 replaces Disciplinary Rule 5-101(A)(1), the conflict of interest and self-dealing provision of the Disciplinary Rules identified in the Toledo Bar Association's complaint.

[8]Rule 8.4(c) states that it is professional misconduct for an attorney to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

[9]Rule 8.4(h) states that it is professional misconduct for an attorney to "engage in any other conduct that adversely reflects on the lawyer's fitness to practice law."

inferences contrary to a witness' testimony based solely on documentary evidence is unsupportable.

Moreover, the record also evinces that substantial testimonial evidence in fact was elicited during the hearing. For instance, the Toledo Bar Association presented testimony from Douglas Welsh, a certified public accountant, explaining that the transfer of the Benfer Farm was a "sham transaction" that was done solely to allow Cook to avail herself of nearly $225,000 in tax deductions. Although Cook presented testimony by Stuart Sherman, a tax attorney and adjunct professor at Wayne State University Law School, challenging Welsh's conclusions, the fact remains that testimony was presented on this issue. Furthermore, testimony from members of Cook's staff directly contradicted Cook's testimony on several points, including Cook's claim that she was not aware of the dating error until 2004 or 2005.

In light of the overwhelming documentary evidence of misconduct, and the numerous instances of supporting testimony, we conclude that there was more than adequate support for the Hearing Panel to conclude that Cook acted improperly, and thus no basis for Cook's assertion that her federal proceedings were somehow tainted by such errors.

### 3. Hearing

Finally, Cook asserts that the Supreme Court of Ohio denied her due process by failing to hold a hearing regarding her objections to the Hearing Panel's recommendations. In Ohio, a panel of the Board of Governors on Attorney Discipline makes findings of fact and conclusions of law that are then considered by the full Board. *See* Ohio Gov. Bar Rule V § 6(G)-(K). If the Board adopts the panel's findings and conclusions, it then makes recommendations to the Supreme Court of Ohio. *See* Ohio Gov. Bar Rule V § 6(K)-(L). Ohio disciplinary procedures permit an attorney to make objections to those recommendations. And, Cook contends, the Supreme Court of Ohio's rules also "provide for" a hearing on those objections.

In this case, Cook made objections to the Board's recommendations, but the Supreme Court of Ohio cancelled the scheduled hearing on those objections because Cook's attorney was unable to attend the hearing because he was trapped in Detroit by a severe snowstorm that apparently had closed the airports and highways. Cook asserts that the failure to hold a hearing on her objections amounts to a denial of due process.

Cook, however, has provided no support—and we can find none—for the notion that due process requires such a hearing. Cook also fails to identify any rule of the Supreme Court of Ohio *requiring* a hearing under these circumstances. Nor can Cook show that the Supreme Court's decision not to hold this particular hearing denied her the opportunity to be heard. In fact, the record is replete with numerous proceedings and forums in which Cook was afforded a full opportunity to be heard. Initially, Cook was permitted to respond in writing to the disciplinary inquiry letter sent by the Toledo Bar Association. Cook also was permitted to file papers in response to the complaint. Over two days in August of 2006, the Hearing Panel conducted a full hearing into the charges against Cook. At that hearing, Cook was represented by counsel, introduced witnesses in her defense, and testified at length in her own defense. Cook then was permitted to file objections to the Board's recommendations. And after the Supreme Court entered the disbarment order, Cook moved for reconsideration and again raised objections to the Board's findings and conclusions. In fact, Cook specifically challenged the Supreme Court's decision not to hold a hearing on this matter. Given these numerous procedural protections, we conclude that Cook's due process claim on this issue is without merit.

This is especially true because there is absolutely no evidence that Cook was denied the opportunity to raise before the district court whatever objections she would have made at the cancelled state hearing. Once again, this Court is not permitted to review the adequacy of the state proceedings, but only whether any alleged defects in Cook's state proceedings tainted her federal proceedings. Inasmuch as the district court conducted its own hearing and permitted Cook to make whatever arguments she wished, Cook cannot complain that she was denied the opportunity to be heard.

Ultimately, we conclude that, absent any due process violations, the alleged errors in Cook's state disbarment proceedings could not have "so infected" the federal proceedings that Cook effectively was denied due process.

## B.  Infirmity of Proof

In addition to our review of the procedural protections afforded Cook, we also are satisfied that there is sufficient evidence in the record to support the district court's disbarment order. *See Kingsland v. Dorsey*, 338 U.S. 318, 320 (1949) (upholding district court disbarment order under either a "substantial evidence" or "substantial probative evidence" standard); *Charlton v. FTC*, 543 F.2d 903, 906-08 (D.C. Cir. 1976) (applying a preponderance-of-the-evidence standard).  After examining the record, we are satisfied that there is more than ample evidence in the record to support the district court's disbarment order.  As detailed above, the record strongly supports the conclusion that Cook intentionally backdated the deed to help a client circumvent Medicaid's eligibility requirements.  The record also shows that Cook subsequently altered the deed to gain significant tax benefits, and that Cook has attempted to cover up her improper conduct at every turn. Cook's explanation for the backdating "error" is wholly unbelievable and contradicted by numerous other documents in the record.  This alone is a sufficient basis for disbarring an attorney.  *See* ABA Model Rules of Professional Conduct Rule 8.4(d) (attorney misconduct includes "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation").

Moreover, Cook failed to advise her client to seek independent counsel despite the fact that Cook had a personal financial stake in the interactions with her client.  *See* ABA Model Rule 1.8(a)(2) (attorney misconduct includes entering into a business transaction with a client and failing to advise the client in writing "of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction").  Cook also disregarded instructions from Ms. Benfer's new attorney, *see* ABA Model Rule 4.2, and then apparently manipulated Ms. Benfer into signing a petition for guardianship, all in an apparent attempt to conceal her past dealings with Ms. Benfer.

The record thus demonstrates a pattern of serious, recurrent misconduct that supports the district court's conclusion that Cook is not fit to practice law in the federal courts.  *See* ABA Model Rule 8.4.

## C.  Lack of Independent Consideration

Cook also alleges that the district court improperly disbarred her based solely on her disbarment by the Ohio Supreme Court.  Nothing in the record supports Cook's claim that the district court felt bound by the State's disbarment order.  The district court did not rely entirely on the record developed by the state courts, or adopt the findings and conclusions of the state courts without its own inquiry.  Rather, on July 24, 2007, the district court issued a letter to Cook to show cause why disbarment from the bar for the Northern District of Ohio would be unwarranted. The district court's Committee on Complaints and Policy Compliance then conducted its own inquiry into the matter, holding a hearing on November 13, 2007.  At that hearing, Cook was represented by counsel who made arguments on Cook's behalf.  Although the district court relied on the record developed in Cook's state disbarment proceedings, the record does not indicate that the district court found itself bound in any way by the Ohio disbarment order.  In doing so, the district court afforded Cook ample opportunity to show cause why disbarment was unwarranted.  On this record, it is evident that the district court satisfied its duty "not to disbar except upon the conviction that, under the principles of right and justice, [it is] constrained so to do."  *Selling*, 243 U.S. at 51.

## IV.

For the foregoing reasons, we hereby **AFFIRM** the order of the district court permanently striking Linda S. Cook from its roll of attorneys.

_____

**CONCURRENCE**

_____


ROGERS, Circuit Judge, concurring.  I concur in the majority opinion.  I write separately only to express my understanding that our review in this case does not extend to the sufficiency of the evidence in the state disbarment proceeding.