RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0109p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 18-1101

GERALD DANESHVAR,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cr-20362-1—Avern Cohn, District Judge.

Decided and Filed:  April 29, 2019[*]

Before:  SILER, COOK, and BUSH, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Elizabeth L. Jacobs, Steven Fishman, Detroit, Michigan, for Appellant.  Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

JOHN K. BUSH, Circuit Judge.  In the old days, every doctor made house calls to treat patients.  In more recent days, Dr. Gerald Daneshvar made house calls as part of a conspiracy to commit Medicare fraud.

---

[*]This decision was originally filed as an unpublished opinion on April 29, 2019.  The court has now designated the opinion for publication.

Daneshvar's conspiracy lasted from 2012 to approximately 2013, during his time at a company called Mobile Doctors. Ultimately, Daneshvar was charged with one count of a conspiracy to commit healthcare fraud and two counts of healthcare fraud. A jury convicted Daneshvar on the conspiracy count but found him not guilty of the other two counts. Daneshvar was sentenced to 24 months in prison. This appeal followed.

The record demonstrates that Daneshvar's trial was fair and that none of the district court's rulings during that proceeding should be reversed. Furthermore, we find no reversible error with his sentencing. We therefore **AFFIRM**.

## I.      BACKGROUND

### A.  Medicare

Medicare is a taxpayer-funded healthcare benefit program for persons who are 65 and older and for those under 65 with disabilities. Typically, a Medicare beneficiary visits a doctor's office and Medicare reimburses the doctor for the provided service. Medicare also pays for doctors' home visits in certain circumstances; however, house calls cost Medicare more money than treatment in a doctor's office. Thus, to qualify for a home visit, a patient must be homebound, which occurs if the patient has a condition because of an illness or injury that restricts the patient's ability to leave his or her place of residence without the aid of a supportive device (e.g., cane, wheelchair, etc.). Also, the homebound patient actually must need the physician's services.

Given the voluminous number of beneficiaries and doctors, Medicare does not review each home healthcare claim. Instead, Medicare relies upon doctors to accurately and honestly bill the services they provide.

### B.  Mobile Doctors

In 2003, Dike Ajiri, a non-medical professional, opened Mobile Doctors, headquartered in Chicago. It eventually expanded into seven states, including Michigan, and offered physician services to homebound Medicare beneficiaries. It hired doctors who agreed to assign their Medicare billing rights to the company. After a home visit, each doctor would fill out a routing

slip describing the patient's diagnoses using Medicare codes and certifying that a qualified home visit had occurred. The original of the routing slip stayed with the patient file, while the carbon copy went to Mobile Doctors, which sought payment from Medicare. Upon receipt of payment, Mobile Doctors would then pay the physician-employee a percentage of what the company received from billing Medicare.

The problem with this business model was that a large portion of Mobile Doctors's patients, in fact, did not qualify as being homebound. For instance, one doctor saw a supposedly homebound patient return home carrying groceries. Another patient rescheduled her appointment because she was bowling. Nevertheless, Mobile Doctors's physicians were undeterred in characterizing such patients as homebound. In some instances, the doctors went even further: they signed certifications for additional unneeded treatment from companies that provided at-home nursing or physical therapy services—companies that had referred the patients to Mobile Doctors.

For many patients, whether legitimately homebound or not, Mobile Doctors exaggerated the services they needed. For example, Mobile Doctors scheduled each patient for a home visit every 30 days, regardless of whether it was necessary. At most, only half of these patients needed the prescribed medical care.

Mobile Doctors also engaged in upcoding, a fraudulent practice in which a healthcare provider submits a Medicare code for a more serious and more expensive diagnosis or procedure than the provider actually diagnosed or performed. Typically, at each home visit, a doctor met with a patient for 15 minutes at a minimum. Then, the doctor filled out the routing slip and, regardless of how healthy the patient was, the doctor usually selected only the two most expensive Medicare reimbursement codes for home healthcare. These top two codes are supposed to be rare because Medicare limits them to complex visits lasting around an hour and requiring extensive examination and treatment. But, Mobile Doctors utilized these codes for almost every doctor's visit, even visits as short as 10 minutes, which involved no tests or other assessments.

In order to justify the higher-reimbursement codes, Mobile Doctors instructed their physicians to list at least three diagnoses in the patient file; if the doctors did not list enough, then a staff member added more to meet the three-diagnoses minimum. Typical diagnoses used to pad the claims were conditions that are common to persons over 50 years old: degenerative joint disease, degenerative disk disease, high blood pressure, chronic pain, arthritis, and vitamin D deficiency.

Mobile Doctors only paid their physicians if they checked at least one of the top two billing codes on their routing slips. If the doctor billed for the higher of the top two codes, the doctor was paid more. And each doctor knew which codes paid the most. Every two weeks, physicians received a pay chart detailing the pay for all doctors at the company. The pay chart detailed the number of patients the physician visited per code, and how much Mobile Doctors paid for that particular code.

Mobile Doctors also encouraged their physicians to order diagnostic tests at specific intervals and required baseline laboratory tests either once or twice per year, whether the patients needed the tests or not. This testing was authorized by a "standing order" that Mobile Doctors required its physicians to sign even though Medicare prohibits testing ordered pursuant to standing orders. But Mobile Doctors thought otherwise: A doctor received bonuses from Mobile Doctors based, in part, on how many tests were authorized under that doctor's name pursuant to the standing order.

C. Daneshvar's Involvement with Mobile Doctors

In September 2012, Dr. Gerald Daneshvar[1] joined Mobile Doctors as a physician in its Michigan office. He enrolled with Medicare, signed over his Medicare billing privileges to Mobile Doctors, and certified that he would abide by the rules set forth by Medicare and would not submit false claims.

Daneshvar then began conducting home visits. In return, for submitting his routing slips, he received payment from Mobile Doctors along with a pay chart detailing the pay for each

---

[1]Daneshvar is referred to as "Dr. Gerry" in some of the trial exhibits and testimony.

physician per patient visit and Medicare code. But, Daneshvar later confessed that approximately 30 percent of his patients that he certified as homebound were, in fact, not so. And, according to one medical assistant, Robin Johnson, the fraud was even worse: Johnson testified that as many as half of Daneshvar's patients were not homebound.

In fact, every time medical assistant Danielle Mangan went with Daneshvar for home visits, there would be at least one patient who was not even at home when they arrived for the visit. Medical assistant Shannon Guyton had similar experiences with Daneshvar. She testified that many of the patients could drive or leave their homes without assistance. One of Daneshvar's patients also testified that she would regularly leave her house for daily activities such as going to the store. Another patient cancelled her appointment because "[s]he was getting ready to leave," and yet another was not home because he was "out with his friend." (Trial Tr. Vol. 3, R. 110, Page ID # 951, 988–89.) Once, when medical assistant India Brimberry was conducting home visits with Daneshvar, she saw a patient pull up in his car with bags, returning from a store. Another patient, Kevin Barrett, biked regularly and played in his church band. Barrett was honest: he told Daneshvar that he was not homebound. But such honesty did not carry over to Daneshvar's Medicare certifications.

In the patient charts, Daneshvar would pre-sign forms documenting the face-to-face encounter, because Medicare rules state that a physician needs to make an in-person visit. Then, the clinical coordinator would fill out the diagnoses based on the routing slip or the exam notes within the chart. The forms stated, "I certify that based on my findings the following services are medically necessary home health services. Check all that apply." (Trial Tr. Vol. 2, R. 109, Page ID # 798.) The form continued, "Further, I certify that my clinical findings support that the patient is homebound (i.e., absences from home require considerable and taxing effort and are for medical reasons or religion services or infrequently or of short duration . . . for other reasons . . .)." (*Id.* at Page ID # 799.)

Daneshvar not only fraudulently presented patients' homebound status, but he also referred his patients to home healthcare agencies for other unneeded services. Daneshvar once admitted to medical assistant Guyton that one of his patients "didn't need the [medical] service,

they weren't homebound." (Trial Tr. Vol. 2, R. 109, Page ID # 930.) But, that isolated instance of candor was not indicative of Daneshvar's practice generally.

As it turned out, Daneshvar would conduct the most home visits of any doctor employed by Mobile Doctors. During his employment, he saw almost 4,000 patients, which worked out to be around 20 patients per day. In order to handle such a large volume, according to several medical assistants, Daneshvar evaluated the patient in approximately 10 to 15 minutes, shorter in duration than evaluations by other physicians employed by Mobile Doctors. And Daneshvar scheduled every patient for his speedy visit every 30 days, regardless of whether the patient needed the house call. At each visit, Daneshvar would typically write three to four diagnoses for the patient on a routing slip; sometimes the clinical coordinator added diagnoses based on the patient chart. Daneshvar even acted as seemingly clairvoyant: he sometimes filled out the diagnoses before he even met with the patient.

After completion of Daneshvar's home visits, the routing slip was transmitted to the Chicago office, where the Mobile Doctors staff engaged in upcoding. (*See* Trial Tr. Vol. 3, R. 109, Page ID # 804 ("Upcode per Dr. Gerry.").) Daneshvar admitted that "most of his patients were billed at a 4 or 5 level even though they qualified for 3 or lower." (Trial Tr. Vol. 5, R. 112, Page ID # 1363.) Sometimes, Daneshvar himself checked a box with the appropriate Medicare code on the routing slip. Other times, a medical assistant checked the box on Daneshvar's behalf and placed a copy of the routing slip in the patient file. Daneshvar never disapproved of the codes on routing slips, and his signature appeared on all of the routing slips for his home visits. Mobile Doctors would pay Daneshvar whenever he billed at least one of the top two codes. Mobile Doctors also billed Medicare for two or three times the number of hours Daneshvar actually spent with the patient, based upon the routing slip.

At one point, Daneshvar asked Dr. Stephen Mason, another Mobile Doctors employee, how he could make more money. Dr. Mason told him that "[w]e can't bill any higher than we are already billing. We are billing too high already." (Trial Tr. Vol. 4, R. 111, Page ID # 1147.) But there was another way to boost the bottom line—giving injections of medications into the patients' musculoskeletal systems. Dr. Mason was getting paid extra for every injection. His experience led Daneshvar to do the same.

Along with injections, early-and-often testing was a money-maker. Daneshvar signed the Mobile Doctors standing order for testing, which stated:

> Mobile Doctors Physician Standing Orders Preventative Care. Mobile Doctors actively promotes preventative care and early intervention. A thorough history and physical examination should be obtained on all of our patients along with preventative care. Based on the billable diagnosis for (enter state) Medicare, I give my clinical coordinator permission to order testing on my behalf when warranted.

(Trial Tr. Vol. 1, R. 108, Page ID # 712–13; Trial Exs., R. 135, Page ID # 1970.) Pursuant to the standing order, Mobile Doctors's staff would sign Daneshvar's name on testing order forms. The test results would come back, they would go to Daneshvar, and he would initial the results. Daneshvar never objected when Mobile Doctors's staff ordered tests on his behalf pursuant to his standing order.

Ultimately, Daneshvar billed Medicare for almost $1.5 million in claims, was paid a salary of almost $250,000 from Mobile Doctors, and received the highest bonuses of all the doctors employed by the company. Mobile Doctors rewarded Daneshvar handsomely because he "does literally anything we ask," and so "we need to keep him happy." (Trial Tr. Vol. 4, R. 111, Page ID # 1225; Trial Tr. Vol. 5, R. 112, Page ID # 1372–76; Trial Exs., R. 135, Page ID # 1976–79.) In June of 2013, Mobile Doctors re-signed Daneshvar's contract, agreeing to reward him with a $15,000 bonus. Mobile Doctors also agreed to pay Daneshvar an additional $4 per patient, but only when he billed the two highest codes, which were "the actual levels that affect[ed his] pay." (Trial Exs., R. 135, Page ID # 1972.)

D. Medicare Fraud Investigation

Eventually, federal agents caught up with Mobile Doctors. In August 2013, agents executed search warrants at all three Mobile Doctors offices, including the Michigan office where Daneshvar worked. The same day, two agents interviewed Daneshvar at a coffee shop. Daneshvar admitted that: (1) even though he certified his patients as homebound, approximately 30 percent of them were not; (2) he referred patients to home healthcare agencies, including those patients who were not homebound; (3) most of his patient visits lasted 15 to 20 minutes, allowing him to see 20 patients per day; (4) most patients were billed at "4" and "5," the two

highest Medicare codes, and thus, most of his patients were misbilled because they should have been billed at a "3" or lower; and (5) his salary from Mobile Doctors was tied to billing codes "4" and "5."

### E. The Trial

A federal grand jury indicted Daneshvar on one count of conspiracy to commit healthcare fraud, under 18 U.S.C. § 1349, and two counts of healthcare fraud, under 18 U.S.C. § 1347. The case proceeded to a jury trial. On May 8, 2017, the jury convicted Daneshvar of Count 1, but found him not guilty of Counts 2 and 3. Daneshvar filed a motion for a new trial, and the district court denied the motion. On January 18, 2018, the court sentenced Daneshvar to 24 months of imprisonment followed by three years of supervised release and a restitution amount of $900,000. Daneshvar timely appealed.

## II.    DISCUSSION

Daneshvar raises ten grounds for reversal premised on the following four areas of alleged error: (1) the district court abused its discretion in excluding certain evidence; (2) the judge improperly gave two Sixth Circuit criminal pattern jury instructions and one preliminary jury instruction; (3) the judge should have provided a supplemental instruction to the jury after the jury, during its deliberations, posed a question to the court; and (4) the district court abused its discretion when sentencing Daneshvar. We address each category in turn.

### A. Evidentiary Issues

We review the district court's evidentiary rulings for abuse of discretion, which occurred if it made "errors of law or clear errors of factual determination." *United States v. Baker*, 458 F.3d 513, 517 n.6 (6th Cir. 2006) (internal quotation marks and citation omitted). However, "[w]hen a party fails to object to evidence at the trial court, his contention on appeal will prevail only if the trial court's evidentiary decision was plainly erroneous, thus affecting his substantial rights and resulting in a miscarriage of justice." *Id.* at 517. Here, as in *Baker* and *Peak v.*

*Kubota Tractor Corp.*, 559 F. App'x 517, 521 (6th Cir. 2014), "[t]he decision as to the correct standard of review will not affect the outcome of this appeal." *Baker*, 458 F.3d at 517.**²**

Moreover, even if we were to find that the court incorrectly excluded the evidence, "this does not automatically result in a new trial." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). Exclusion of the evidence must have "materially affect[ed] the verdict." *United States v. English*, 785 F.3d 1052, 1056 (6th Cir. 2015); *Kilpatrick*, 798 F.3d at 378 ("Non-constitutional errors are subject to Rule 52(a) harmless error analysis: the government must show *by a preponderance of the evidence* that the error did not materially affect the verdict." (emphasis in original)).

     i.    Admission of the December 27, 2012, Email

Daneshvar's defense was that he was ignorant of the fraud at Mobile Doctors. In support, defense counsel moved to admit an email chain through Daneshvar's testimony. The email, dated December 27, 2012, was sent from Melissa Meredith (the branch manager for Mobile Doctors at the Southfield, Michigan office) to Dike Ajiri (Mobile Doctors's president) stating, in part:

> [W]e don't want [the doctors] asking too many questions about billing etc. [L]et['s] just keep them in the dark, we cover their liability, let us cover ourselves and that's the end of it! We do not brow beat them with mundane details and we give creative control for the treatment of [patients] unless, it['s] something that will harm the [patient] or us. I think we should operate with [standing orders for tests] the same way. They are not stupid, they know we make money off of tests[,] but they also know that it is helping the [patient], that's why they agree to it.

---

**²**Daneshvar argues that the abuse-of-discretion standard does not extend to the exclusion of crucial, relevant evidence establishing a valid defense. In support, Daneshvar cites to *United States v. Riley*, 550 F.2d 233, 236 (5th Cir. 1977). Daneshvar misunderstands the holding in *Riley*. The Fifth Circuit held that, "[a]lthough the trial judge is traditionally accorded a wide range of discretion in the admission of evidence, it is axiomatic that such discretion does not extend to the exclusion of crucial relevant evidence establishing a valid defense. *Id.* at 236 (citation omitted). In other words, the Fifth Circuit held that a district court abuses its discretion if it excludes crucial relevant evidence establishing a valid defense—not that the abuse-of-discretion standard does not apply.

> Sometimes too much can be harmful. Where did I hear that before? Oh yeah, it was you!

(Trial Exs., R. 118, Page ID # 1700.)

On appeal, Daneshvar argues that the district court erred in excluding the email on relevance and hearsay grounds. We agree with Daneshvar that the email was relevant, s*ee* Fed. R. Evid. 401, but we disagree that it was admissible as Daneshvar argues under the business record and residual hearsay exceptions, *see* Fed. R. Evid. 803(6), 807, and the opposing party statement hearsay exclusion, *see* Fed. R. Evid. 801(d)(2)(E).

### a. Relevance

First, as to relevance, the district court appeared to indicate that because the government had already presented evidence demonstrating that Daneshvar knew of the fraudulent billing, the email exchange discussing keeping doctors in the dark about billing was irrelevant. In other words, the district judge treated the government's evidence as conclusively establishing a fact, notwithstanding any contrary evidence. This ruling was in error. Daneshvar's counsel sought to introduce the email to *rebut* the government's evidence of the knowledge that the doctors, including Daneshvar, had of Mobile Doctors's billing practices. Therefore, the email had a tendency to make a fact—the doctors' apparent knowledge of Mobile Doctors's billing practices—"more or less probable." Fed. R. Evid. 401. The jury should have been allowed to consider the email in light of the government's proof, and then determine what weight to assign to each piece of evidence.

We need not resolve, however, whether the district court's erroneous finding that the email was irrelevant materially affected the verdict because the district court properly excluded the email on another ground: hearsay. As explained below, none of the hearsay exceptions or exclusion cited by Daneshvar apply.

### b. Records of a Regularly Conducted Business Activity

Both before the district court and upon appeal, Daneshvar argued that the email is admissible as a business record. Pursuant to Federal Rule of Evidence 803(6), a business record

must have been: (a) made at or near the time by, or from information transmitted by, a person with knowledge; (b) kept in the course of a regularly conducted business activity; and (c) made as part of a regular practice of the business. *See* Fed. R. Evid. 803(6). Moreover, all of these conditions must be shown by the testimony of a qualified witness. *Id.*

An email is not a business record for purposes of the relevant hearsay exception simply because it was sent between two employees in a company or because employees regularly conduct business through emails; such evidence alone is insufficient to show that the email is a record, made as "a regular practice" of the company, Fed. R. Evid. 803(6)(C), and that "the record was kept in the course of a regularly conducted activity of a business," *id.* at 803(6)(B). "[I]t would be insufficient to survive a hearsay challenge simply to say that since a business keeps and receives e-mails, then *ergo* all those e-mails are business records falling with the ambit of Rule 803(6)(B)." *United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013). If that were the case, then every single email sent within any company would fall within the exception. This result would obviate the entire purpose of the business records exception, which is designed for a limited category of records—namely those that are regularly produced as a part of a company's business activities.

Of course, an email can qualify as an admissible record of a regularly conducted business activity as long as the proponent satisfies the requirements of Rule 803(6). But, it was no abuse of discretion for the district court to find that those requirements were not met here. We affirm the district court's holding that the email "was not a business record [admissible under Rule 803(6)], but rather a form of conversation"—that is, a one-time discussion regarding what to tell doctors—as this holding was based on no clearly erroneous factual finding or erroneous interpretation of law. (Op. Denying Mot. for New Trial, R. 86, Page ID # 435.).[3]

### c. Residual Hearsay Exception

We also find that the district court did not err when declining to admit the email pursuant to the residual clause of the hearsay rule, Federal Rule of Evidence 807. One of the requirements

---

[3]Moreover, Daneshvar did not offer a qualified witness to testify concerning the requirements of the business record exception. *See* Fed. R. Evid. 803(6)(D).

of Rule 807 is that the evidence being offered "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(3). At trial, Daneshvar repeatedly put forth evidence that the company's doctors were not made aware of Mobile Doctors's final billing processes. For instance, Dr. Mason testified that he was "in the dark" about Mobile Doctors's billing. (Trial Tr. Vol. 4, R. 111, Page ID # 1197.) Physician-employee Dr. Leonard VanGelder likewise testified that he did not have anything to do with actual billing, which was handled by the Chicago office. Daneshvar similarly testified in his own defense.

The testimony of these witnesses precludes reliance on the residual exception. That is, Daneshvar has not demonstrated that the email is more probative than is the testimony for the fact that the doctors did not know about Mobile Doctors's billing practices. Daneshvar argues on appeal that the email has more probative value because it was sent by a "neutral" source, rather than the physicians themselves. However, the jury learned of the actual email, as well as its contents, during the questioning of Dr. Mason when he was asked, "[W]ere you shown an email from Melissa Meredith to Dike Ajiri saying precisely that, I'm not reading it verbatim, but we're doing the best we can to keep the doctors in the dark about billing?" (Trial Tr. Vol. 4, R. 111, Page ID # 1196–97.) Thus, Daneshvar's point—that the company's management was hiding its billing practices from the doctors—could have been, and in fact was, made through the witnesses at trial. It was therefore no abuse of discretion for the district court to hold that the email was inadmissible under Rule 807.[4]

### d. Co-Conspirator Exclusion

For the first time on appeal, Daneshvar also argues that the email is not hearsay because it was a statement made by his co-conspirators, and therefore excluded from the hearsay definition, pursuant to Federal Rule of Evidence 801(d)(2)(E). Daneshvar misapplies this Rule,

---

[4]Even if the district court's exclusion of the email had been in error, it would constitute harmless error. As noted, the substance of the email was already admitted, through Dr. Mason's testimony, at trial. *See generally United States v. Schaeffer*, 626 F. App'x 604, 609 (6th Cir. 2015) (holding that "even assuming that [a] letter was admissible as a statement against interest under Fed. R. Evid. 804(b)(3) or under the residual hearsay exception, Fed. R. Evid. 807, the evidence against [the defendant] on the count to which [the] letter related was overwhelming and the letter offered only weak support to [the defendant's] case").

which states that "[t]he statement [must be] offered against an opposing party" and must have been "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2), (d)(2)(E). Daneshvar incorrectly seeks to use his own co-conspirators' statements on his behalf, not against an opposing party. Moreover, even if Daneshvar were somehow using the statements against the government, the statements were not made by "[that] party's coconspirator"—that is, the statements were not made by the government's coconspirators. Fed. R. Evid. 801(d)(2)(E). Thus, the email does not fall within Rule 801(d)(2)(E) and there was no abuse of discretion to exclude it as hearsay by the district court.

ii.     Admission of Joel Trombley's and Daneshvar's Testimony

Defense counsel attempted to elicit testimony from both Daneshvar and Joel Trombley regarding Daneshvar's work at a later employer, the American Health Care Network (AHCN). Trombley was employed as a medical assistant by Mobile Doctors and then worked with Daneshvar at AHCN. Defense counsel attempted to establish that after Daneshvar left Mobile Doctors for AHCN, he became more involved in the billing process, began to scrutinize bills to make sure they were accurate, and "that once he learned, once he saw what happened he changed his ways." (Trial Tr. Vol. 6, R. 113, Page ID # 1437.) The government objected on the grounds of relevance, and the court sustained the objection. The court determined that "how [Daneshvar] conducted himself at a subsequent place of employment is not relevant to the issue in this case" because this "case involves what happened with Mobile Doctors." (*Id.*)

On appeal, Daneshvar argues that he offered the AHCN evidence as "reverse Rule 404(b) evidence." Daneshvar points out that our circuit has recognized that reverse 404(b) evidence is when "the evidence of a prior act by another is offered as exculpatory evidence by the defendant, instead of being used by a prosecutor against a defendant." *United States v. Lucas*, 357 F.3d 599, 605 (6th Cir. 2004). However, in *Lucas*, we held that "the Advisory Committee Notes following Rule 401 explain that rules such as Rule 404 and those that follow it are meant to prohibit certain types of evidence that are otherwise clearly 'relevant evidence.'" *Id.* Thus, at the outset, we must determine whether the evidence is relevant under Rule 401, and if so, whether it should nonetheless be excluded as improper propensity evidence pursuant to Rule 404(b).

We agree with the district court that evidence of Daneshvar's conduct after he left Mobile Doctors is not relevant, as the fraud and conspiracy at issue occurred only while Daneshvar was at Mobile Doctors.  Daneshvar's post-Mobile Doctors evidence is not that of his potentially exculpatory actions undertaken *prior or during* the time of the fraud, but rather, pertain to activities conducted *after* the fraud ended.  Thus, even if Daneshvar employed legal billing practices after his time at Mobile Doctors, that fact does not change or alter the evidence presented regarding his actions while conspiring to commit fraud at Mobile Doctors.

Moreover, we have held that "[f]or the same reason that prior 'bad acts' may not be used to show a predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes."  *United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014).  Even considering the merits of Daneshvar's argument that his post-Mobile Doctors conduct tended to make his lack of intent more probable, which is an acceptable purpose for admission under Rule 404(b), the evidence of Daneshvar's future billing practices does not qualify as "reverse 404(b)."  Daneshvar's attention to billing after he left Mobile Doctors is not "evidence of a *prior act by another*," *Lucas*, 357 F.3d at 605 (emphasis added), but rather, is evidence of *his own future* acts.  *See also United States v. Armstrong*, 436 F. App'x 501, 503 (6th Cir. 2011) ("[E]vidence of a *prior act* by another is offered as exculpatory evidence by the defendant, instead of being used by a prosecutor against a defendant." (emphasis added)) (citation omitted); *United States v. Clark*, 377 F. App'x 451, 458 (6th Cir. 2010) (same); *United States v. Robinson*, 272 F. App'x 421, 430 (6th Cir. 2007) (analyzing reverse 404(b) as "evidence of *prior acts of a third party* offered by a defendant" (emphasis added)).

Accordingly, the district court did not abuse its discretion in excluding evidence of Daneshvar's billing conduct after he left Mobile Doctors.

iii.    Admission of the Summary Charts

Daneshvar also argues that the trial court committed reversible error when it excluded two proposed summary exhibits that Daneshvar sought to admit through his own testimony.  We disagree.

On cross-examination, defense counsel questioned the government case agent about two exhibits admitted into evidence during the government's case-in-chief. These exhibits compiled the Medicare data for Mobile Doctors and displayed each doctor-employee's total Medicare billings and number of home visits. (Trial Exs., R. 135, Page ID # 1984–86, 1989–90.) The charts showed that Daneshvar billed over $1.4 million to Medicare, more than any other physician employed by Mobile Doctors, and that he visited the greatest number of patients, as compared to the other doctors. Defense counsel asked the government case agent to use both of the exhibits to calculate the average amount that Daneshvar had billed to Medicare per patient and then compare it to the same calculation for the other physicians. This arithmetic yielded the average amount that each physician billed to Medicare per patient. The agent agreed that "by looking at the charts," he "would say yes," the average amount billed to Medicare per patient visit was higher for other doctors than for Daneshvar. (Trial Tr. Vol. 5, R. 112, Page ID # 1393.)

The next day, defense counsel sought to introduce into evidence two summary exhibits listing the same calculation for each doctor and his or her average amount billed to Medicare per patient. The government objected on relevance grounds, and defense counsel responded that in light of government making "a big point about how [Daneshvar's] amount of money" billed to Medicare was at least $1.4 million, the proposed charts show that Dr. Guzman "had a lot higher ratio of how much money was billed per patient visit than Dr. Daneshvar." (Trial Tr. Vol. 6, R. 113, Page ID # 1480–81.) Thus, the charts "show[] that Dr. Daneshvar, while he had a very large number of visits, the amount of money billed for his visits put him about fifth or sixth" as compared to the other physician's billings per patient visit. (*Id.*)

The district judge remarked that Dr. Guzman was not on trial and held that "[t]he fact that some other doctor billed even more per visit is irrelevant to what this doctor did." (*Id.* at Page ID # 1483.) After some back-and-forth, defense counsel again attempted to explain the relevance of the summary exhibits, stating, "The government brings in summary exhibits and they argue from them through their witness about what a big crook he is, and then I'm prohibited from showing that with the same numbers . . . Dr. Daneshvar is fifth of the group . . . ." (*Id.* at Page ID # 1484.) The court responded that "according to your theory, if they are all crooks, he [Daneshvar] rated number five as a crook. Somebody was more crooked than he was." (*Id.*)

Defense counsel responded that this was not his theory and contended, "It's just to contradict [the government's] chart. I mean why is their chart admissible to show he got all of this money, and I can't explain the difference . . . ?" (*Id.*) The court nonetheless denied Daneshvar's request on relevance grounds and prohibited defense counsel from asking any more questions about the calculation. (*Id.* at 1486.)

On appeal, Daneshvar argues that the summary charts were relevant and admissible pursuant to Federal Rule of Evidence 1006, which allows for the use of a summary, chart, or calculation. Daneshvar cites to *United States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998) (internal quotation marks and citations omitted) for the proposition that "the proponent of the summary must also have made the documents available" to the other side so the opposing party can "attack the authenticity or accuracy of a chart, summary, or calculation, with an opportunity to prepare for cross-examination, or to offer exhibits of its own as rebuttal evidence, which would serve to counteract the impression made on the jury by the proponent's witness." Finally, Daneshvar argues that the court denied him his constitutional right to present evidence on his own behalf by prohibiting him from asking questions about the arithmetic calculation.

Even if we were to agree with Daneshvar that the summary charts and the corresponding calculations were relevant and admissible, thus finding that the district court erred, such error was harmless because Daneshvar elicited the same information for the jury's benefit earlier in the trial. As detailed earlier, Daneshvar elicited information concerning how much he billed to Medicare on average per patient visit, as compared to the other physicians, during his counsel's cross-examination of the government's case agent. Also, at closing argument, Daneshvar's counsel argued that the government exhibits did not

> make an attempt to show how much money was billed by Mobile Doctors per patient visit. That's what they didn't do. So you—because I was able to do it with my Mumford High School arithmetic, you can do it yourself. You can take those numbers. You don't need to make it exact, and you can divide how many visits into how much billing was generated.

(Trial Tr. Vol. 8, R. 121, Page ID # 1774.) Thus, the jury was presented with the very facts that Daneshvar's counsel wanted to convey with his proposed exhibits.

Furthermore, "the evidence against [Daneshvar] on the count to which [the summary charts] related was overwhelming and [the summary charts] offered only weak support to [Daneshvar's] case." *Schaeffer*, 626 F. App'x at 609. Even if Daneshvar was not the top fraudulent biller to Medicare per patient visit, the evidence demonstrates that he nevertheless billed fraudulently to Medicare. That he billed less per patient than the other doctors is only "weak support" for his argument. *Id.*

Consequently, we find that any alleged error regarding the district court's ruling on the defense's proposed summary charts constitutes harmless error.

B.  Jury Instructions

For the first time on appeal, Daneshvar argues that it was error for the trial judge to give certain jury instructions; in particular, he takes issue with three instructions. Because Daneshvar "did not object to the district court's jury instructions, we review for plain error." *United States v. Carmago-Antonio*, 541 F. App'x 678, 679 (6th Cir. 2013) (citing *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006)); Fed. R. Crim. P. 30(d). "In the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Semrau*, 693 F.3d 510, 528 (6th Cir. 2012) (internal quotation marks and citation omitted).

i.  Deliberate-Ignorance Jury Instruction

The district judge read the following instruction to the jury:

Now I want to explain something about proving a defendant's knowledge. No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that Mobile Doctors was engaged in a fraud, you may find that he knew that Mobile Doctors was engaged in a fraud.

But to find this you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that Mobile Doctors was engaged in fraud and that defendant deliberately closed his eyes to what was obvious. Carelessness or negligence or foolishness on his part is not the same as knowledge and is not enough to convict. This, of course, is all for you to decide.

(Trial Tr. Vol. 8, R. 121, Page ID # 1815–16.)

Daneshvar concedes that this instruction mirrors the Sixth Circuit Pattern Jury Instruction 2.09, with no modification, which is used to define the "knowledge" requirement for the charged offenses.[5]  However, he argues that our circuit has held "that the decision to give this instruction is to be approached with significant prudence and caution.  More specifically, we have noted that the instruction should not be given routinely because of the risk of a conviction based on mere negligence, carelessness or ignorance."  *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012) (citing *Mari*, 47 F.3d at 785).  We have said that the instruction should "be used sparingly."  *Geisen*, 612 F.3d at 486.  Daneshvar argues that this is an instance in which the instruction should not have been given because the government did not provide evidence that he deliberately turned a blind eye to Mobile Doctors's activities.

"This is not, of course, our first encounter with this instruction."  *Mitchell*, 681 F.3d at 876.  "What [Daneshvar] challenges . . . is the propriety, in light of the evidence presented at trial, of giving the instruction at all.  He contends that the jury could not have within reason found, based on the evidence, that he was deliberately ignorant of the existence of the [Medicare fraud]."  *Mari*, 47 F.3d at 785.  We resolved the issue raised by Daneshvar in *Mari*, and we are bound by that decision to hold that the district court did not commit plain error in giving the instruction.  *See id* at 785–86 (explaining rationale for the instruction and circumstances in which, even if the instruction was given mistakenly, "giving the Sixth Circuit Pattern Jury Instruction on deliberate ignorance was harmless as a matter of law").

ii.    Conspiracy Jury Instruction

The district court also read the following jury instruction to the jury:

If you are convinced there was a criminal agreement, then you must decide whether the government has proved that the defendant knowingly and voluntarily joined that agreement.  To convict the defendant, the government must prove that he knew the conspiracy's main purpose, that he voluntarily joined it intending to help or achieve its goals.

---

[5]We have repeatedly held that this instruction is an accurate statement of the law.  *See, e.g.*, *United States v. Geisen*, 612 F.3d 471, 486 (6th Cir. 2010); *United States v. Beaty*, 245 F.3d 617, 622 (6th Cir. 2001); *United States v. Mari*, 47 F.3d 782, 785 (6th Cir. 1995).

> This does not require proof that the defendant knew everything about the conspiracy or everyone else involved or that he was a member of it from the very beginning. Nor does it require proof that the defendant played a major role in the conspiracy or that his connection to it was substantial. A slight role or connection may be enough.

(Trial Tr. Vol. 8, R. 121, Page ID # 1817–18.)

This instruction is identical to the Sixth Circuit Pattern Jury Instruction 3.03. Daneshvar argues that we "should take this opportunity to disavow the jury instruction" (Appellant Br. at 40), and in doing so, he makes the same argument as in *United States v. Mahbub*, 818 F.3d 213, 230 (6th Cir. 2016), where the defendant contended that the jury instruction lowers the burden of proof. In *Mahbub*, we held:

> [The defendant's] contention lacks merit. The instruction states, and the district court read, "[a] *slight role* or connection may be enough" to link a defendant to a conspiracy, which is an accurate legal proposition. *See United States v. Price*, 258 F.3d 539, 544 (6th Cir. 2001) ("The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt."); *United States v. Betancourt*, 838 F.2d 168, 174 (6th Cir. 1988) ("The existence of a connection to the conspiracy must be shown beyond a reasonable doubt, but the importance of the connection need not be great."). To the extent that the disputed language lowers the burden of proof to support a conviction, we note that "no single provision of the jury instruction can be read in isolation;" instead, "the charge must be considered as a whole." *United States v. Horton*, 847 F.2d 313, 322 (6th Cir. 1988).

*Id.* We determined that "the district court made it abundantly clear that the reasonable-doubt standard applied in determining whether [the defendant] should be found guilty of criminal conspiracy" by using the phrase "beyond a reasonable doubt" in the jury instructions. *Id.*

Daneshvar argues that unlike in *Mahbub*, "the rest of the jury instructions in this case combined to relieve the government of its high standard of proof and replace it with speculation and probabilities." (Appellant Br. at 39.) We do not find that Daneshvar's argument has merit, let alone establishes that the district court committed plain error. As in *Mahbub*, the district court here repeatedly used the reasonable-doubt standard. Before beginning the conspiracy section, the court stated: "A conspiracy is a kind of criminal partnership. For you to find the defendant guilty of the conspiracy charge, the government must prove each and every one of the

following elements beyond a reasonable doubt . . . ." (Trial Tr. Vol. 8, R. 121, Page ID # 1816.) Again, the court stated, "You must be convinced that the government has proved all of these elements beyond a reasonable doubt in order to find the defendant guilty of the conspiracy charge." (*Id.* at Page ID # 1817.)

Although Daneshvar points out that other circuits do not use the phrase "slight evidence," our circuit continues to do so, so long as, considering the jury instructions as a whole, the instructions do not lower the burden of proof. *See Mahbub*, 818 F.3d at 230; *see also United States v. Price*, 258 F.3d 539, 544 (6th Cir. 2001) ("The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt."). Upon reviewing the jury instructions as a whole, including the district court's repeated use of the reasonable-doubt standard, we find that the instructions did not lower the burden of proof.[6] Thus, we find no error in the use of the conspiracy jury instruction.

### iii. Presumption of Innocence Preliminary Jury Instruction

At the start of the trial, the district court provided the parties with a set of preliminary jury instructions the court intended to use, and neither side objected. One of these instructions read:

> Now, there are some basic rules about a criminal case you must keep in mind. First, the defendant is presumed innocent until proven guilty. The indictment against a defendant is only an accusation, nothing more. It's not proof of guilt or anything else. The defendant, therefore, starts out the case with a clean slate.

(Trial Tr. Vol I, R. 108, Page ID # 612–13.)[7]

---

[6]Daneshvar argues that the deliberate-indifference jury instruction, combined with the conspiracy jury instruction that was given, lowers the burden of proof. But other than arguing, as we discussed above, that the government failed to present evidence that he acted with deliberate indifference, Daneshvar presents no other argument or evidence that the deliberate-indifference jury instruction can lower the burden of proof. We find that this sort of conclusory statement is, "bereft of factual and legal support, [thus, Daneshvar] has not properly developed this argument." *Gafurova v. Whitaker*, 911 F.3d 321, 328 (6th Cir. 2018). Similarly, Daneshvar, in one sentence of his brief, argues that the use of the words "natural and probable" by the district court in the jury instructions resulted in lowering the burden of proof. Again, he presents no other argument or authority for support. Thus, we hold that Daneshvar has forfeited these arguments.

[7]The instructions are copied from those in the model preliminary jury instructions for criminal trials published in the Benchbook for federal district judges. *See* Federal Judicial Center, Benchbook for U.S. District

Daneshvar argues that this instruction does not mirror that found in the Sixth Circuit Pattern Criminal Jury Instruction 1.03, which states that the "presumption of innocence stays with [the defendant] unless the government presents evidence here in court that overcomes the presumption." In particular, Daneshvar takes issue with the district court's use of the word "until," in comparison to the pattern jury instruction's use of the word "unless."

Daneshvar has not established plain error from the district court's preliminary instructions. The Supreme Court has stated that the use of the word "until" in the following instruction is "quite correct":

> The defendant is presumed to be innocent of all the charges against him ***until*** he is proven guilty by the evidence submitted to you. This presumption remains with the defendant until such time, in the progress of the case, that you are satisfied of the guilt beyond a reasonable doubt . . . . Every man is presumed to be innocent until he is proved guilty, and this legal presumption of innocence is to be regarded by the jury in this case as matter of evidence, to the benefit of which the party is entitled.

*Agnew v. United States*, 165 U.S. 36, 51 (1897) (emphasis added).

As in *Agnew*, in which the jury instructions included phrases such as "guilt beyond a reasonable doubt" and "presum[ption] of innocence," the context of the instructions in the instant case demonstrates that Daneshvar was presumed innocent as the trial began. The district court stated that Daneshvar "starts out the case with a clean slate," that he had "no burden to prove innocence," and that "the government must prove the defendant guilty beyond a reasonable doubt." (Trial Tr. Vol. 1, R. 108, Page ID # 613.) Thus, the instruction, "especially when considered in its context," was not improper. *United States v. Hynes*, 467 F.3d 951, 956–57 (6th Cir. 2006) ("But even if the isolated statement could be interpreted as improper, the district court avoided any prejudice to [the defendant] by twice instructing the jury on the presumption of innocence.").

We also note, as Daneshvar concedes, that the district court told the jury there would be "further instructions" later, and he used the "unless" phrase at the end of the trial, when he

---

Court Judges § 2.07 (6th ed. 2013). We have recognized that judges should use this Benchbook. *See United States v. McDowell*, 814 F.2d 245, 249–50 (6th Cir. 1987).

delivered jury instructions prior to the jury deliberation period.  (*See* Trial Tr. Vol. 1, R. 108, Page ID # 613; Trial Tr. Vol. 8, R. 121, Page ID # 1808.)

In sum, we do not find that the jury instruction is clearly or obviously incorrect so as to constitute plain error.

C.  Response to Jurors' Question

Daneshvar also raises issue with the district court's response to the jurors' question, which was posed to the court during the middle of jury deliberations.  Daneshvar argues that, after the foreperson asked this question, the court failed to clarify the issue concerning the legal definition of conspiracy.

We find no error in the district court's response to the jury.  To explain our reasoning, we recount below the exchange between the district judge and the jury, and between the judge and parties' counsel, during jury deliberations.

On the second day of deliberations, the jury requested readback of certain pieces of testimony.  Later in the day, the court received a note from the jury stating: "We have reached our verdict on Counts 2 and 3 SOLID.  We are at a hard hung jury on Count 1, no budging. Please advise."  (Trial Tr. Vol. 9, R. 78, Page ID # 341.)  At first, both defense counsel and the government requested an *Allen* charge,[8] but then, both parties agreed with the court's suggestion to first speak to the foreperson.  The court told the foreperson that, "[i]n my experience, you haven't deliberated very long."  (*Id.* at Page ID # 342).  The court then asked, "Is it your view that there's a question that could be answered possibly or a portion of a testimony that could be read possibly that might I suppose I would say achieve movement?"  (*Id.*)

The foreperson responded that the jurors were "getting hung up a little bit on the conspiracy."  (*Id.* at Page ID # 343.)  The foreperson asked, "So is conspiracy—how do I describe this—can it be Mobile Doctors, the company as a whole?  Does that make sense?"  (*Id.*) The court responded, "Well, there's an instruction on what constitutes conspiracy."  (*Id.*)  The

---

[8]In *Allen v. United States*, 164 U.S. 492 (1896), the Supreme Court approved the use of a jury instruction intended to prevent a hung jury by encouraging jurors to render a verdict.  This instruction has now become known as the *Allen* charge.

foreperson then remarked that "[t]here's a lot of variables to it that some rather than others are having more difficulty with." (*Id.*)

The court next inquired as to whether "my rereading a portion of the instruction would be helpful?" (*Id.*) The foreperson replied that "it might be," and directed the court to a portion of the jury instructions that was the issue. (*Id.* at Page ID # 343–44.) The foreperson stated that "some of the jurors feel that . . . ," but, before the foreperson or court could proceed further, the government requested a sidebar. (*Id.* at Page ID # 344.) The court sent the foreperson back to the jury room.

The government attorney explained that she was afraid the foreperson would reveal what the jurors had been deliberating. The judge responded that the foreperson was "telling me that there's a hang-up on what this means." (*Id.* at 345.) The judge then said, "Let me suggest something to you. [T]he note I just got does not come as a surprise to the Court. [I]f this is a hung jury, the likelihood of you retrying this case is not very great." (*Id.*) When the government attorney protested to this characterization, the judge responded, "[w]ell, I'm telling you, you may have some problems in that regard, I don't know. But I think you ought to let her [the foreperson] elaborate." (*Id.*)

The government attorney then expressed concern that when the foreperson started to use the phrase "some of us," the foreperson was about to reveal information about what the jurors had been deliberating about. (*Id.* at 346.) The judge responded, "I don't know what she's going to say. I've asked her if the Court can give her any assistance. And she can tell us, and I can say I can't respond to that. That's not revealing what—she's revealing what the hang up is and she's suggesting that the instructions are inadequate is what she's saying." (*Id.*)

Defense counsel remarked that it appeared the jury was having trouble understanding whether Daneshvar "[c]an . . . be convicted of conspiring with the entity Mobile Doctors[.] [A]nd the answer to that is no, you can't conspire with an entity." (*Id.*) The judge responded, "I don't know what she was saying then. We started over." (*Id.*) Defense counsel again reiterated what he believed to be the foreperson's question and added that "if they're having problems with the instruction, . . . all the court can do is say, 'you have the instructions.'" (*Id.* at Page ID #

346–47.)  The court responded, "I understand that I cannot comment.  I can only listen to her and then see what she has to say and then either say, 'I—I appreciate what you're saying,'" and then either remind the jury to "take the instructions as a whole" and "can't single out any one or more," or "hear out" the foreperson.  (*Id.*)  Defense counsel agreed and stated, "I'm good with that."  (*Id.* at 347, 348 ("That's fine with me . . .").)

At this point, the court summoned the foreperson, and asked, "tell me now, what is it . . . that concerns the panel?"  (*Id.* at 348.)  The foreperson responded, "So, before I do that, can I tell you about the conversation we just had . . . ?"  (*Id.*)  The foreperson then explained that "[s]ome people don't think all the variables were made in Count 1 and they . . . [are] not going to come off that opinion."  (*Id.*)  The foreperson pointed out where in the jury instructions some jurors felt as though "[n]ot all of those [elements] have been made in this juror's eyes."  (*Id.* at Page ID # 348–50.)  The court reacted by sending the foreperson back into the jury deliberation room and again conferring with the parties.

During the sidebar, defense counsel "recommend[ed] that the Court take the verdict as to Counts 2 and 3 and declare a hung jury as to Count 1."  (*Id.* at Page ID # 350.)  The government opposed this recommendation, requesting instead an *Allen* charge because the jury had "only been deliberating for three hours yesterday and four or five hours today."  (*Id.*)  After the court agreed to give the *Allen* charge, defense counsel responded, "I'm a little worried of a rushed verdict, although it sure doesn't sound like it will be one.  But if we would give them the *Allen* charge, I'm fine, and then let them go and come back Monday."  (*Id.* at Page ID # 350–51.)  Though the court at first resisted the defense's adjournment request, ultimately the court agreed, previewed the *Allen* charge for the parties, and asked if it was okay.  Both counsel agreed it was acceptable.

The court then read the jurors the *Allen* charge and sent them home for the weekend.  The following Monday, May 8, 2017, the jury returned their verdict.

On appeal, Daneshvar argues that the verdict was improper because the district court should have given a supplemental instruction defining conspiracy.  The government responds that Danehvar's challenge to the district court's response should begin and end with waiver

because defense counsel intentionally relinquished any objection to the court's ultimate decision to read the *Allen* charge and make no other supplemental instruction. We agree.

In *United States v. Budd*, 496 F.3d 517, 529 (6th Cir. 2007), we held that even when counsel had raised objections to the jury instructions, his subsequent statement that he was "comfortable" with the instructions meant that he "cannot now complain about the court's explanation of the Fourteenth Amendment standard." Here, not only did defense counsel state that he was "fine" with the *Allen* charge, but also, after the foreperson asked whether "it" (presumably, the conspiracy) could be "Mobile Doctors, the company as a whole," Daneshvar's counsel responded with: "[A]ll the court can do is say, 'you have the instructions.'" (*Id.* at Page ID # 346–47, 350–51.) Thus, at no point did defense counsel ask for a supplemental jury instruction regarding conspiracy and in fact, counsel asked the judge to reread the conspiracy jury instructions as the court had initially delivered them.

True, in *United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir. 1989), we held that "[w]hen a jury indicates confusion about an important legal issue, it is not sufficient for the court to rely on more general statements in its prior charge." However, we further stated that "[t]he government is mistaken in stating that [the defendant] never raised the issue of whether an agreement only between him and [the DEA agent] would be sufficient. [The defendant's] attorney made this very point in his closing argument. Furthermore, the jury raised the issue, and that imposed a duty upon the trial judge to respond." *Id.* at 1569.

Unlike the defense attorney in *Nunez*, defense counsel here did not raise the particular issue that he now claims confused the jury. Second, and more importantly, the foreperson in *Nunez* clearly asked a question regarding the applicable law: "Can [the defendant] make an agreement with [the DEA agent] to satisfy the agreement element in a conspiracy?" *Id.* at 1567. The *Nunez* foreperson also asked, "Can [the DEA agent] be considered a co-conspirator?" *Id.* In the case at hand, by contrast, the first time the foreperson appeared before the district court, she asked, "So is conspiracy . . . can it be Mobile Doctors, the company as a whole?" (Trial Tr. Vol. 9, R. 78, Page ID # 343.) The second time the foreperson appeared before the court, she did not ask a question. She clarified that the hang-up was that "[s]ome people don't think all of the

variables were made in Count 1 and they . . . [are] not going to come off that opinion." (*Id.* at 348.)

It is not clear to us that the jury asked a question in the instant case so as to be considered the sort of definite inquiry giving rise to a supplemental instruction as was the case in *Nunez*. We found in *Nunez* that "[t]he jury **pointedly** asked if [the DEA agent] could be a co-conspirator and if an agreement between [the defendant] and [the DEA agent] would 'satisfy the agreement element in the conspiracy.'"  889 F.2d at 1569 (emphasis added).  Here, the foreperson's question did not reference Daneshvar at all, let alone ask whether Daneshvar could conspire with Mobile Doctors under the applicable law regarding conspiracy.  The trial judge also did not indicate that he understood defense counsel's interpretation of the juror question—that the jury wanted to know if Daneshvar could conspire with Mobile Doctors—to be what the foreperson asked. (Trial Tr. Vol. 9, R. 78, Page ID # 346 ("I don't know what she was saying then.").)

In *Nunez*, we clarified that "the propriety of a supplemental instruction must be measured 'by whether it fairly responds to the jury's inquiry without creating . . . prejudice.'"  *Id.* at 1568 (quoting *United States v. Giacalone*, 588 F.2d 1158, 1166 (6th Cir. 1978)).  Here, the district judge twice asked the foreperson to explain the question premised on the jury confusion, and thus, the judge attempted to understand the question.  In fact, the second time the foreperson was brought out to the court, the foreperson explained what the issue was: some jurors believed the government had not satisfied all of the elements required under Count 1.  We cannot see how a supplemental instruction regarding the legal definition of conspiracy would have aided the jury at this point, as it appears that the issue presented to the court concerned what to do when jurors do not budge from their differing opinions.

Thus, the trial judge's decision to read the *Allen* charge was more appropriately tailored to the jury's issue, because through the *Allen* charge, the judge urged the jury to reevaluate the evidence presented for Count 1.  The judge stated, "You have advised me that you believe you are unable to reach a verdict and have asked what . . . can be done.  This is an instruction . . . . [T]his is how I'm going to answer your question." (Trial Tr. Vol. 9, R. 78, Page ID # 353.)  The judge then proceeded to read the *Allen* charge.  In this way, the judge appropriately provided a

supplemental instruction "to clear up uncertainties which the jury brings to the court's attention." *Giacalone*, 588 F.2d at 1166.

We therefore hold that Daneshvar waived any objection to the district court's response to the jury's inquiry, but even if he had preserved the issue, the district court's actions upon receiving the jury question were not in error.

### D. Sentencing Issues

#### i.    Acceptance of Guilt

Daneshvar also argues that the district court considered an impermissible factor implicating Daneshvar's constitutional right when the court sentenced him.  Specifically, Daneshvar argues that he was punished for deciding to go to trial, in violation of his Sixth Amendment right to have a jury trial.  We disagree.

It is true that at sentencing, the district judge stated that "[t]here was a trial," and "[i]t reduces rather significantly the lower level of the variance because by going to trial the Court is satisfied that he does not acknowledge the fact that he was guilty, does not accept responsibility for his wrongdoing."  (Sentencing Hr'g Tr., R. 107, Page ID # 583.)  However, after there was some discussion during which the judge confirmed that he had reviewed Daneshvar's supplemental sentencing memorandum, the judge explained:

> [N]owhere has there been an explanation for why the doctor went to trial. Nowhere has there been an explanation for why he put the government to the expense and difficulty of establishing his guilt by a jury.  Now, that's his constitutional right, and I'm not denigrating it, but I have not seen anything where the doctor—and it's too late now—says I made a mistake, I was wrong, I should be punished.  Nowhere have I seen that.

(*Id.* at Page ID # 588).  Daneshvar's counsel did not object to this statement by the court.

The government argues that Daneshvar forfeited his sentencing objection because his counsel did not raise it below.  But, the failure of Daneshvar's counsel to object in the district court does not forfeit his right to appeal the issue: as the government concedes, the sentencing decision is reviewable for plain error.  *See United States v. Cabrera*, 811 F.3d 801, 808 (6th Cir. 2016); *United States v. Davis*, 751 F.3d 769, 773 (6th Cir. 2014); *United States v. Vonner*, 516

F.3d 382, 386 (6th Cir. 2008) (en banc). As we explain below, we find that the court did not plainly err when considering Daneshvar's lack of remorse and responsibility.

Regardless of whether Daneshvar's sentencing challenge "is categorized as being procedural, substantive, or a combination of the two, it is clear that a sentence based on an improper factor fails to achieve the purposes of § 3553(a) and may be unreasonable." *Cabrera*, 811 F.3d at 809 (cleaned up). However, unlike the district court's impermissible reliance upon the defendant's decision not to testify at trial in *Cabrera*, Daneshvar's refusal to accept responsibility was a permissible basis for the district court's decision not to impose a lesser sentence. *See In re Cook*, 551 F.3d 542, 551 (6th Cir. 2009) (holding that it is "well established that a defendant's remorse—or lack thereof—is an appropriate consideration in meting out punishment."). The transcript of Daneshvar's sentencing in this case is clear: while the district judge noted Daneshvar's decision to go trial, the judge also stated, "that's [Daneshvar's] constitutional right, and I'm not denigrating it." (Sentencing Hr'g Tr., R. 107, Page ID # 588.) The judge explained that the real issue was that he "ha[d] not seen anything where the doctor . . . says I made a mistake, I was wrong, I should be punished. Nowhere have I seen that." (*Id.*)

The district court's statements here were markedly different than those in *Cabrera*, where the sentencing judge recognized that "everybody has the constitutional right to go to trial," but also found that the defendant "never put [himself] on the record . . . at the trial." 811 F.3d at 807. The *Cabrera* sentencing judge further stated, "I have to tell you, from my standpoint . . . I view that as an incredibly cynical attempt to game the whole system here[,]" and that the defendant "conjured up" a "fantastical story," "evinc[ing] a total disrespect for the law." *Id.* Here, by contrast, the district court did not rely upon Daneshvar's decision to go to trial as evidencing a malicious intent towards the criminal justice system or resulting in disrespect for the law. Instead, the district judge explained that his primary concern was Daneshvar's acceptance of guilt.

Daneshvar's argument is similar to that raised by the defendant in *Mitchell*. In that case, "[a] significant aspect of [the defendant's] argument is that he was not involved in the . . . scheme" and thus, the defendant argued "that he cannot take responsibility for something that he did not do." 681 F.3d at 884. Similarly, Daneshvar argued that he was not fully aware of the

scheme, nor was he an essential part of it. Daneshvar's counsel spent much of the trial demonstrating that Daneshvar was less culpable and less involved in the conspiracy than other members.

As we held in *Mitchell*, it is relevant that the jury found Daneshvar had participated in the conspiracy, which is a permissible fact for a district court's 3553(a) analysis. "[T]he district court found that [Daneshvar's] continued efforts to deny his involvement demonstrated a failure to take responsibility for his crime and a lack of remorse for the harm he had caused. The judge could have reasonably concluded that [Daneshvar]'s dishonesty regarding important pieces of evidence indicated that he had not fully accepted responsibility for his participation in the conspiracy." *Id.* (cleaned up) (citing *United States v. Sutton*, 387 F. App'x 595, 607 (6th Cir. 2010)).

"Accordingly, 'it was not [Daneshvar]'s exercise of his right to [a jury trial], but rather, that he did not accept responsibility for his crime, that the district court took into account in considering the § 3553(a) factors. This was not error.'" *Id.* (citing *United States v. Delano*, 411 F. App'x 795, 799 (6th Cir. 2011)). In fact, the district court clarified that it recognized Daneshvar's right to go to trial, and this was not a basis upon which to penalize or "denegrat[e]" him. (Sentencing Hr'g Tr., R. 107, Page ID # 588.) Rather, Daneshvar's "failure to take responsibility and [his] lack of remorse were two *facts* that the court considered in weighing the various § 3553(a) *factors* that it found to be most relevant to the case at hand. This was not unreasonable," nor do we find it to be plainly erroneous. *Mitchell*, 681 F.3d at 885.

###### ii. Minor Role Reduction

Daneshvar argues that the court also erred when it denied his request for a two-level reduction under the United States Sentencing Guidelines ("U.S.S.G.") § 3B1.2 based on his minor role in the conspiracy.

The defendant bears the burden of proving a mitigating role by a preponderance of the evidence. *See United States v. Roberts*, 223 F.3d 377, 379 (6th Cir. 2000). "Generally, this Court reviews a district court's legal conclusions regarding the Sentencing Guidelines *de novo* and its factual findings for clear error, though certain exceptions apply." *United States v.*

*Williams*, 420 F. App'x 517, 518 (6th Cir. 2011) (internal quotation marks and citation omitted). We have explained that "[t]he 'minor participant' reduction is available only to a party who is 'less culpable than most other participants' and 'substantially less culpable than the average participant.'" *United States v. Lloyd*, 10 F.3d 1197, 1220 (6th Cir. 1993) (quoting U.S.S.G § 3B1.2, cmt. n.3). "Whether a defendant is entitled to a downward offense-level adjustment under U.S.S.G. § 3B1.2 depends heavily on factual determinations by the district court, which this court reviews for clear error." *United States v. Auston*, 355 F. App'x 919, 925 (6th Cir. 2009) (internal quotation marks and citation omitted).

The issue arises from the district's failure to make any factual determinations on the record. During Daneshvar's sentencing, defense counsel asked the court to rule on his objection to the Presentence Report in which he asked for a two-point reduction for Daneshvar's purported minor role in the conspiracy. (Sentencing Hr'g Trans., R. 107, Page ID # 579–80, 582.) The district judge stated that Daneshvar "will not be given an adjustment for [a] minor role. He was a major player." (*Id.* at Page ID # 582.) The court offered no other analysis, and defense counsel did not object.

It is true that typically, when a defendant challenges a district court's denial of his request for a role reduction to his sentence, we have found that the district court did not abuse its discretion or commit clear error if the district court provided an explanation for why it denied the defendant's request. But here, we are faced with the unique situation in which a district court has made no factual findings or elaborated upon its rationale, although the sentencing judge was the same judge who presided over the trial and thus, presumably had some insight into Daneshvar's role. We adopt here the rationale of the Ninth Circuit, holding that "a district court need not tick off sentencing factors to show that it considered them," but a court cannot, for instance, "adopt[] the government's argument with little elaboration." *United States v. Diaz*, 884 F.3d 911, 914–15, 918 (9th Cir. 2018). In the instant case, we find that the district court erred in denying the defendant's role reduction request without elaboration on the record as to why the court found Daneshvar to be a "major player."

Is this error harmless? "Under the harmless error test, a remand for an error at sentencing is required unless we are certain that any such error was harmless—*i.e.* any such

error 'did not affect the district court's selection of the sentence imposed.'" *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005) (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)).

In determining whether Daneshvar was "less culpable than most other participants" and/or "substantially less culpable than the average participant," we turn to the U.S.S.G. advisory committee notes to § 3B1.2, which provide a non-exhaustive list of factors for a court's consideration:

> (i)     The degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)    The degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii)   The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)    The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v)     The degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, cmt. n.3(C).

There was evidence that Daneshvar significantly benefitted from the criminal activity: although he was with Mobile Doctors for approximately one year, he was paid the most of all of the physicians employed by the company, receiving over $200,000 in salary payments plus a $15,000 bonus. § 3B1.2, cmt. n.3(C)(v). Daneshvar also had the authority to certify that patients were homebound, which he did even with the knowledge that many of his patients were not homebound; he signed off on routing slips including at least three diagnoses for each patient, even when the patient did not suffer from the diagnoses; and at times, Daneshvar personally authorized Mobile Doctors to bill Medicare for the two highest billing codes for patients from whom the codes did not apply. § 3B1.2, cmt. n.3(C)(iii) (iv). Although Daneshvar was not

involved in the planning or organization of Mobile Doctors, nor was he aware of every part of the scheme, he understood how Mobile Doctors generated money from fraudulently billing Medicare because he received a pay chart detailing the amount Mobile Doctors paid to each physician per billed Medicare code.  § 3B1.2, cmt. n.3(C)(i) and (ii).

For these reasons, we find that although the district court erred in its analysis, the error was harmless because the evidence plainly demonstrated that Daneshvar was not a minor participant in the conspiracy.

### iii.    Calculation of Guidelines Range

Daneshvar argues that his sentence was procedurally unreasonable because the district court did not calculate the appropriate sentencing Guidelines range before pronouncing the sentence.

The district court began the sentencing by stating Daneshvar's offense level, criminal history score, and the United States Probation Office's recommendation of a sentencing range of 63 to 78 months.  (Sentencing Hr'g Tr., R. 107, Page ID # 579.)  Next, the court stated that, based upon the parties' sentencing memoranda, it "intends to vary the sentence from the recommendation and the guidelines." (*Id.*)  Thus, the court asked whether, "[i]n light of the fact that the Court intends to grant a variance that will be rather substantial," was it "necessary to resolve" outstanding objections. (*Id.*)  Defense counsel responded that although he "would say say no," it was not necessary to resolve the objections, counsel was under the impression that our circuit required resolution of outstanding objections and an articulation of the Guidelines range during sentencing.  (*Id.* at Page ID # 579–80.)  The court accepted counsel's request and then went through each of the outstanding objections.

First, the court explained that as to the objection concerning the "loss amount," it found "the restitution amount as a compromise between what the defendant says and what the government says" because "there hasn't been an independent audit presented to the Court establishing the loss by the Government." (*Id.* at Page ID # 581.)  The second objection dealt with the "abuse of trust" enhancement in the Sentencing Guidelines.  Defense counsel argued against application of the enhancement, and the court agreed.  The third and final objection

concerned Daneshvar's role in the offense, and, as detailed earlier, the court rejected Daneshvar's request for a role reduction.

The court next moved into consideration of Daneshvar's sentence. As we discussed earlier, the court explained it did not find that Daneshvar had shown remorse or accepted responsibility for his actions. The court also inquired about the sentences of Daneshvar's co-conspirators, as well as particular similarities and differences between the cases, to avoid sentencing disparity.

The court then asked if the parties wished to address the court, and a lengthy discussion ensued. After hearing arguments from both parties, the court pronounced the sentence.

"A district court commits procedural error by '*failing to calculate* (or improperly calculating) *the Guidelines range*, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" *United States v. Fowler*, 819 F.3d 298, 304 (6th Cir. 2016) (citation omitted). In *United States v. Blackie*, 548 F.3d 395, 401, 403 (6th Cir. 2008), the court determined that it could not "meaningfully review [the defendant's] sentence" because the district court had not acknowledged the Guidelines range, failed to give specific reasons for its variance, and failed to clarify whether it had rejected various Guidelines enhancements. We have held that this "combination warrant[ed] reversal." *United States v. Turner*, 536 F. App'x 614, 620 (6th Cir. 2013).

Here, the district court began by acknowledging the recommended Guidelines sentencing range, including Daneshvar's criminal history score and total offense level that led to this range. At no point did the court indicate that it considered the Guidelines range as mandatory; in fact, the court announced that it would be varying from the Guidelines range. Next, the court considered all of the outstanding objections and resolved them. Finally, the court provided specific reasons both for and against variance, including: (1) Daneshvar's lack of acceptance of responsibility, (2) sentencing disparities in comparison to Daneshvar's co-conspirators and, (3) sentencing disparities in comparison to other physicians who were charged under the same statute. Only then did the court pronounce the sentence. Pursuant to our circuit's case law, the

sentence was procedurally reasonable, and the district court did not err.[9] *See also United States v. Aleo*, 681 F.3d 290, 299 (6th Cir. 2012) (finding no error when the sentencing judge did not re-calculate the Guidelines range after the defendant raised an objection to his sentencing enhancement because the district court properly resolved the objection to the enhancement).

## III.   CONCLUSION

Medicare fraud has long plagued the American healthcare system. Fraud and systematic upcoding are estimated at roughly 10 percent of Medicare's costs every year. The taxes spent on prosecution of Medicare fraud add even more to the program's costs. But, the expense and difficulty of trying a Medicare fraud case, or indeed, any criminal case in which the defendant chooses to go to trial, are part of the worthwhile price we pay as a people who have the constitutional right of trial by jury. Daneshvar was able to exercise this right and his sentence does not reflect that he was unfairly penalized in any way.

For the reasons stated above, we **AFFIRM** both the district court's rulings at trial and Daneshvar's sentence.

---

[9]We also note that after the court announced the sentence, the government requested to put into the record the Guidelines calculation. The government stated that Daneshvar's offense level was 20 (from a base offense level of 6, plus a 14-point enhancement for the loss amount, and the court did not accept any other enhancements). The court accepted this calculation, as did defense counsel, who also stated that he believed this resulted in a Guidelines range of 37 to 46 months. Thus, the appropriate Guidelines calculation was placed in the record for our review.