NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0291n.06

Case No. 20-3305

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jun 17, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| RAYSHAWN D. LIGON, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: GIBBONS, COOK, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Rayshawn D. Ligon was convicted of several drug crimes and escape from custody. Ligon now raises various challenges related to the pretrial, trial, and sentencing phases of his case. For the reasons stated below, we AFFIRM Ligon's convictions and sentence.

**I.**

On February 21, 2019, Myrick Dennis, a United States postal inspector, examined a parcel sent by Priority Mail that was addressed to Delano Express Logistics ("Delano"),[1] 7308 Bessemer Avenue, Cleveland, Ohio and had a return address of "John Miller," 1534 Rouse Avenue, Modesto, California. Dennis, who had experience investigating drug trafficking,[2] suspected that the parcel contained narcotics based on the class of mail selected, as well as the parcel's origin, destination,

---

[1] Ligon was employed by Delano from December 2018 through February 2019.

[2] Dennis had been employed by the United States Postal Inspection Service for four years at the time and was assigned to the Prohibited Mail Narcotics team.

and size.[3] The next day, the parcel was placed in a lineup. Cuyahoga County narcotics detection canine, "Ciga," thereafter alerted Michael Twombly, the detective overseeing the inspection, that there was contraband in the suspect parcel.[4] Dennis subsequently obtained a search warrant, and discovered that the parcel contained 332.18 grams of blue fentanyl pills that were marked as oxycodone.

On February 27, 2019, Dennis inspected another suspicious parcel. This parcel was addressed to "Betty Michaels," 987 East 78 Street, Cleveland, Ohio, had a return address of "Mike Johnson," 813 Van Norstrand Court, Modesto, California, and was similarly sent by Priority Mail. The second parcel was placed in a lineup on February 28, 2019, and Ciga indicated to Twombly that this package also contained narcotics. Dennis secured a search warrant for the second parcel, and upon inspection, found 331.10 grams of blue fentanyl pills that were marked as oxycodone.

In an effort to identify the intended recipient of the fentanyl pills, on March 1, 2019, Dennis and several other United States postal inspectors initiated a controlled delivery operation using the second parcel. The postal inspectors modified the contents of the package by removing the pills and replacing them with candy that was roughly the same size and shape as the fentanyl pills. They also inserted a transmitter into the parcel that alerted them when the parcel was opened. Once the parcel was altered and resealed, one of the postal inspectors delivered it to the intended delivery address.

Approximately thirty minutes after the parcel was delivered, the postal inspectors observed a black Jeep Wrangler arrive at 987 East 78 Street. The postal inspectors watched Ligon exit the

---

[3] According to Dennis, individuals engaging in drug trafficking commonly ship parcels using Priority Mail because the Priority Mail system allows for traceability, reliability, and timely delivery.

[4] Twombly and Ciga worked together since 2013, and were both certified in October 2018 by the Ohio Peace Officers Training Academy and the North American Police Working Dog Association. They both also completed 80 hours of a state-certified training program at Shallow Creek Kennels in Sharpsville, Pennsylvania.

Jeep, enter the residence, exit with the parcel, return to his vehicle, and eventually drive to the residence of Latoya Taylor on East 246 Street in Euclid, Ohio. Several minutes after Ligon arrived at Taylor's home, the transmitter notified the postal inspectors that the parcel had been opened. Soon after the package was opened, Ligon ran out of the house with the parcel and re-entered his vehicle. Postal inspector, Bryon Green, proceeded to turn on his police lights and attempted to conduct a felony vehicle stop. In response, Ligon sped off and threw the parcel out of his car window. He then engaged in a high-speed chase with the postal inspectors, crashed his car, and fled on foot. The postal inspectors were able to recover the parcel and several of Ligon's items found in the vehicle, including his cell phone, jacket, wallet, driver's license, birth certificate, Express Wireless receipt, and the business card for his halfway house case worker.

Ligon was finally apprehended over a month later in Wheeling, West Virginia. On April 11, 2019, a West Virginia police officer, Ryan Moore, responded to a call regarding potential drug activity, and stopped a Honda SUV with two occupants, including Ligon.[5] Subsequent to the stop, Moore asked both individuals for identification, and Ligon presented him with an Ohio driver's license for "Timothy Norman." Moore then retreated to his vehicle, performed a records check using the Ohio Law Enforcement Gateway database, and discovered that the photograph for "Timothy Norman" in the database did not match the photograph on the driver's license. After making this discovery, while he was waiting in his vehicle for additional officers and a canine to arrive at the scene, Moore noticed Ligon exited the Honda SUV and took off running. Moore pursued Ligon on foot before detaining him and placing him in handcuffs. While Ligon was subdued, Moore retraced Ligon's flight path, and recovered, among other items, a bag of 12 blue

---

[5] Moore's body camera recorded the ensuing events.

fentanyl pills. When Moore asked Ligon to provide him with a phone number, Ligon gave him the number 216-801-9545 ("801 phone").

For his actions in Ohio, Ligon was ultimately charged in a superseding indictment with conspiracy to possess with intent to distribute fentanyl, in violation of 21 U.S.C. § 846 (Count One); attempt to possess with intent to distribute fentanyl, on two separate occasions, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846 (Counts Two and Three); and escape, in violation of 18 U.S.C. § 751(a) (Count Four). Magistrate Judge David Ruiz appointed the Office of the Federal Public Defender to represent Ligon on May 6, 2019. Assistant Federal Public Defender Timothy Ivey represented Ligon during his initial proceedings, including his waiver proceedings on May 13, 2019 and during a pretrial status conference on June 26, 2019. On June 4, 2019 and June 10, 2019, the government, through two ex-parte notices, expressed to the district court it believed the Office of the Federal Public Defender's representation of Ligon constituted a potential conflict of interest because the Office of the Federal Public Defender also represented Benjamin Ross, who allegedly had the same drug supplier as Ligon and was similarly charged (in a separate case) with distributing fentanyl, in violation of 21 U.S.C. §§ 841 and 846. The district court disqualified the Office of the Federal Public Defender from representing both Ligon and Ross on June 20, 2019, finding that it was imperative for those defendants to have representation that was free of potential conflicts of interest.

On October 11, 2019, Ligon moved to suppress the evidence seized from the parcels that were intercepted by the postal inspectors in February 2019. Ligon contended that the postal inspectors did not possess the necessary reasonable suspicion to seize the drug parcels. He also argued that the government failed to establish the accuracy and reliability of the narcotics detection canine. The district court denied Ligon's motion to suppress by way of issuing a marginal order.

In the district court's order, it indicated it would issue a written opinion explaining its holding; however, the court neglected to do so. Following the district court's denial of Ligon's suppression motion, the case proceeded to trial.

On August 19, 2019, the government filed a notice of intent to introduce certain evidence at trial as background or *res gestae* evidence, or, alternatively, under Federal Rule of Evidence 404(b). Specifically, the government sought to present evidence of Ligon's drug trafficking in West Virginia. Despite Ligon's objection, the district court granted the government's request, determining that the evidence was admissible as both background evidence and under Rule 404(b).

At Ligon's trial, the government offered testimony from several individuals who testified about Ligon's charged conduct. The government presented testimony regarding Ligon's communications with Juan Zazueta-Castro, an inmate at FCI Elkton, who was believed to be involved in drug trafficking. Dennis testified that there were communications between Ligon and Zazueta-Castro about coordinating drug shipments with illicit substances that contained fentanyl for at least a few months before the suspect parcels were sent in February 2019. Additionally, Dennis specifically testified that seven other drug parcels had been delivered to Delano prior to February 2019, and that the messages exchanged between Zazueta-Castro and Ligon indicated that both individuals had a role in the delivery of those packages.

The jury also heard testimony from DEA agent, Paul Stroney. Stroney testified that an unidentified person's cellphone—with the number 440-412-9015 ("440 phone")—called a cellphone that allegedly belonged to Ligon—with the number 216-262-0594 ("262 phone")—an hour and forty minutes after Ligon fled from the postal inspectors on March 1, 2019.[6] Stroney

---

[6] The record demonstrates that the 262 phone belonged to Ligon. Taylor testified that she communicated with Ligon on March 1, 2019 using the 262 phone. The 262 phone number was also listed on the Express Wireless receipt discovered in Ligon's vehicle on March 1, 2019. Finally, the 262 phone was found inside the vehicle that Ligon abandoned on March 1, 2019.

additionally testified that the 440 phone called and texted the 801 phone, which was connected to Ligon as well, multiple times between March 1, 2019 and March 4, 2019.[7] There was also testimony from Stroney indicating that the 440 phone tracked the shipment status of both intercepted packages online.

Prior to the conclusion of the trial, pursuant to Federal Rule of Criminal Procedure 29, Ligon moved for an acquittal with regard to Count Two, arguing that there was insufficient evidence for the jury to find him guilty of that charge. The government responded that there was enough circumstantial evidence to find Ligon guilty of Count Two. The court denied Ligon's motion, finding that there was sufficient evidence in the record for that matter to be submitted to the jury.

The jury found Ligon guilty on all counts. During Ligon's sentencing hearing on January 29, 2020, the district court mentioned various factors that it would take into consideration before sentencing Ligon, including his criminal history, the nature and circumstances of his offenses, and the need to protect the public. On March 9, 2020, the court issued a sentencing memorandum, in which it thoroughly explained why it was sentencing Ligon to 360 months' imprisonment.[8] Given Ligon's offense level of 32 and criminal history category of IV, his Guideline statutory minimum term of imprisonment was 300 months and subjected him to a maximum term of life imprisonment.[9] The district court varied upwards from the statutory minimum term by 60 months, reasoning that Ligon "set himself apart from other offenders in his criminal category" and "continues to engage in criminal activity, specifically possessing and selling drugs (including

---

[7] Stroney determined that between that time period, the 440 phone called the 801 phone 18 times and texted the phone 22 times.

[8] Ligon was sentenced to 360 months as to Counts One, Two, and Three, and 60 months as to Count Four, with all sentences to run concurrently.

[9] Ligon's Guidelines range was 188 months to 235 months, but pursuant to 21 U.S.C. § 841(b), that range increased because it was less than the statutory minimum sentence of 300 months.

opiates), that puts himself and the public at risk, despite serving multiple sentences for the same or similar conduct."

Ligon's timely appeal followed.

## II.

### A. Counsel Disqualification

Ligon first argues that the district court erred when it disqualified the Office of the Federal Public Defender from representing him. Ligon contends that because there was no actual or serious conflict of interest as a result of the Office of the Federal Public Defender representing him and another separately indicted defendant who was believed to have the same drug supplier, his initial counsel should have been permitted to represent him throughout the duration of the case.

We review a district court's decision to disqualify counsel for an abuse of discretion. *United States v. Cardin*, 577 F. App'x 546, 552 (6th Cir. 2014) (citing *United States v. Swafford*, 512 F.3d 833, 839 (6th Cir. 2008)). The district court is given "wide latitude" in making these determinations, and a court's decision regarding the disqualification of counsel must be upheld unless it is "arbitrary [or] without adequate reasons." *United States v. Mays*, 69 F.3d 116, 121 (6th Cir. 1995).

The Sixth Amendment states that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Although "the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment," *Wheat v. United States*, 486 U.S. 153, 159 (1988), "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them[,]" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006); *see Daniels v. Lafler*, 501 F.3d 735, 739 (6th Cir. 2007).

Ligon did not have the right to select his *court-appointed* counsel. We have acknowledged that while "a defendant relying on court-appointed counsel has no constitutional right to the counsel of his choice[,]" "[t]he replacement of court-appointed counsel might violate a defendant's Sixth Amendment right to adequate representation or his Fourteenth Amendment right to due process if the replacement prejudices the defendant[.]" *Lafler*, 501 F.3d at 740. Ligon claims that his trial counsel was ineffective for not making certain strategic decisions, but based on the record, we cannot find that Ligon was prejudiced by the district court's decision to disqualify the Office of the Federal Public Defender from representing him. *See id.* (offering examples of instances when a defendant could be prejudiced by the district court's decision to replace his counsel, including if the court appointed new counsel to a defendant hours before a trial was scheduled to begin or substituted a skilled lawyer with an unskilled lawyer).

Even if Ligon did have the right to select his court-appointed counsel, it would be of no consequence because the district court did not violate Ligon's Sixth Amendment right to counsel. When evaluating a motion to disqualify counsel in which one party asserts that there is a conflict of interest, the district court must consider not only any actual conflicts, but also whether there is "a serious potential for conflict." *Wheat*, 486 U.S. at 164. Here, the district court ruled that because Ligon and Ross potentially had overlapping information about their drug supplier, if the issue of cooperation arose, it could put them in competition with each other to obtain the most beneficial cooperation agreement. Since the district court reasonably explained why it was necessary to disqualify the Office of the Federal Public Defender from serving as counsel to Ligon (and Ross)—and therefore did not arbitrarily reach its decision, *see Mays*, 69 F.3d at 121—the district court did not abuse its discretion by appointing new counsel to represent Ligon.

**B. Motion to Suppress**

Ligon raises several Fourth Amendment challenges related to the evidence seized in February and March of 2019. Ligon argues that the district court erred by denying his motion to suppress because Dennis lacked the reasonable suspicion necessary to detain the parcels in February 2019 until they were subjected to a canine inspection. Ligon also claims that the felony vehicle stop conducted on March 1, 2019 was an unlawful seizure. He additionally contends that it was error for the district court not to determine the reliability of the two canine sniffs. Finally, Ligon asserts that the district court should have held an evidentiary hearing and was required to issue a proper written ruling explaining its denial of his suppression motion.

"When reviewing the denial of a motion to suppress, we will set aside the district court's factual findings only if they are clearly erroneous, but will review *de novo* the court's conclusions of law." *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015). A factual finding will be clearly erroneous only when, after reviewing the evidence, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). In such instances, "we consider the evidence in the light most favorable to the government." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) (quotation omitted).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Warrantless searches violate the Fourth Amendment's guarantee against unreasonable searches and seizures . . . ." *United States v. Smith*, 549 F.3d 355, 359 (6th Cir. 2008). The burden is on the government to prove the legality of a warrantless search. *United States v. Beal*, 810 F.2d 574, 577 (6th Cir. 1987).

First, we find that Ligon lacks standing to challenge the search and seizure of the packages. In order for Ligon to establish that he had standing to challenge the detainment of the parcels, he must show that: (1) "he manifested a subjective expectation of privacy in the object of the challenged search;" and (2) "society is prepared to recognize that expectation as legitimate." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988) (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). Here, Ligon could not have had any subjective expectation of privacy in the packages because he did not send them and they were not addressed to him personally.[10] *See United States v. Elgin*, 57 F. App'x 659, 661 (6th Cir. 2003). In any event, Dennis had a reasonable suspicion that both packages contained narcotics due to the parcels' class of mail, origin, destination, and size, which we find was a legitimate assessment considering he had several years of experience identifying drug parcels. *See United States v. Robinson*, 390 F.3d 853, 870 (6th Cir. 2004) ("[O]nly reasonable suspicion, and not probable cause, is necessary in order to briefly detain a package for further investigation, such as examination by a drug-sniffing dog."). Accordingly, Ligon's Fourth Amendment rights were not violated as a result of Dennis detaining the parcels.

Second, the felony vehicle stop was not conducted in violation of the Fourth Amendment. According to Ligon, his vehicle was unlawfully seized on March 1, 2019 when Green attempted to conduct a traffic stop. *See United States v. Seymour*, 739 F.3d 923, 928 (6th Cir. 2014) ("A traffic stop effects a seizure of the passengers in the car . . . ."). Further, Ligon contends that because the postal inspectors did not obtain a warrant before Green tried to engage in the vehicle stop, the seizure was unlawful, and therefore, any evidence obtained as a result of the attempted

---

[10] Ligon argues that he had an expectation of privacy in the first parcel because it was addressed to his employer. That argument is unavailing because in addition to the fact that it is debatable whether Ligon was still employed by Delano when the first package was seized, he could not have had a subjective expectation of privacy in a package that he did not send and was sent to his employer—and not to him specifically.

seizure should have been suppressed as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963). "[B]ecause a seizure does not occur when a mere show of authority occurs, but only when one yields to a show of authority, the fourth amendment does not apply to anything one may abandon while fleeing the police in an attempt to avoid a seizure." *United States v. Martin*, 399 F.3d 750, 752 (6th Cir. 2005) (citing *California v. Hodari D.*, 499 U.S. 621, 629 (1991)). We have found this general rule to be applicable "even when the show of authority is an unlawful one." *Id.* (citing *Hodari D.*, 499 U.S. at 624 n.1). In the instant case, Ligon participated in a car chase with Green, crashed his vehicle, fled, and was not arrested until over a month later. Therefore, Ligon's argument fails because even if the postal inspectors did not lawfully initiate the felony vehicle stop, the evidence shows that Ligon abandoned the vehicle and he was not *seized* by the postal inspectors. *See id.* ("[W]hen a suspect refuses to submit to a show of authority by the police, the suspect is not seized by the police until such time as he or she submits or is forced to submit to police authority.").

Third, the district court did not err by presuming that the canine sniffs were valid. Ligon asserts that pursuant to *Florida v. Harris*, 568 U.S. 237 (2013), he should have been allowed to establish the canine's unreliability through oral argument. In his suppression motion, Ligon argued that the affidavits to search the mail packages lacked probable cause because the affidavits did not "state the canine's prior history, number of arrests, false alerts, etc." and the government did not provide "any information setting forth the dog's accuracy and history of deployments." Ligon claims that this argument amounts to a challenge of Ciga's reliability and requires an evidentiary hearing under *Harris*. We disagree.

Ligon did not challenge the canine's underlying reliability, but instead complained about the type of evidence contained in the search warrant. The Supreme Court in *Harris* found that the

government did not need to provide a specific record of a dog's history, and explained that "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Harris*, 568 U.S. at 246–47. Here, the affidavits to search the mail packages stated that Twombly had "been State Certified as a Narcotics Canine handler," that Twombly and Ciga "were both certified in October 2018 by the Ohio Peace Officers Training Academy . . . and in October 2018 by the North American Police Working Dog Association[,]" and had "completed 80 hours of a state-certified training program[.]" Because Ligon did not contest that Ciga was certified by a bona fide organization, the district court did not err by presuming that the canine's alert provided probable cause to search without holding an evidentiary hearing. *See id.*

Fourth, with regard to Ligon's suppression motion, the district court did not err by failing to issue a written ruling denying his request or by deciding not to hold oral argument. Though the district court was neglectful by failing to provide Ligon with a written order, we must affirm the district court's decision if it is correct for any reason. *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985). Consequently, because we find that the district court properly denied Ligon's motion to suppress, it is not relevant to our overall analysis that the court failed to issue a written order. Moreover, the district court was not obligated to hold an evidentiary hearing before denying Ligon's motion to suppress. "[A] defendant is not entitled to an evidentiary hearing if his argument is 'entirely legal in nature.'" *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019) (quoting *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006)). Because Ligon only raised legal contentions in his suppression motion, the district court did not err in its decision to not hold an evidentiary hearing.

## C. Constructive Amendment Regarding Count One

Ligon contends that the district court erred by amending the jury instructions in such a manner that modified his charged offense in Count One. Count One charges Ligon with knowingly and intentionally combining, conspiring, confederating, and agreeing with others, known and unknown to the grand jury, to "possess with intent to distribute a mixture and substance containing approximately 663.28 grams of fentanyl" in violation of 21 U.S.C. § 846. The verdict form read:

> Question 1(a). With respect to Count 1, the amount of the mixture or substance containing a detectable amount of fentanyl involved in the conspiracy as a whole was (indicate answer by checking one line below):
>
> ____400 grams or more
> ____40 grams or more
> ____less than 40 grams

Ligon asserts that the district court erroneously indicated to the jury that the government was required to prove that the mixture or substance that he possessed with the intent to distribute contained "a detectable amount of fentanyl," instead of 663.28 grams of fentanyl, as stated in the superseding indictment. As Ligon acknowledged, he is claiming that the district court constructively amended the superseding indictment by changing the jury instructions.

We generally review *de novo* whether an indictment has been constructively amended by jury instructions. *United States v. Pritchett*, 749 F.3d 417, 428 (6th Cir. 2014). However, when a defendant has not raised a specific objection to a constructive amendment before the district court, as is the case here, "we are limited to 'plain error' review on appeal." *United States v. Benson*, 591 F.3d 491, 497 (6th Cir. 2010) (quoting *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008)). To succeed on plain-error review, a party must show that there was an "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*,

516 F.3d 382, 386 (6th Cir. 2008) (en banc) (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)) (internal quotation marks omitted).

"A constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003). Constructive amendments "are considered *per se* prejudicial and are reversible error." *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007).

Here, the district court did not constructively amend the superseding indictment. Ligon claims that the use of the term "detectable amount" in the jury instructions alters Count One. In order to find Ligon guilty of 21 U.S.C. § 846, based on his drug possession as set forth in 21 U.S.C. § 841, the jury needed to determine that Ligon conspired to possess with the intent to distribute "*a mixture or substance containing a detectable amount of* [*fentanyl*.]" 21 U.S.C. § 841(b)(1)(A)(vi); *see United States v. Harris*, 774 F. App'x 937, 941 (6th Cir. 2019). Whether the substance that Ligon possessed contained 663.28 grams of fentanyl was irrelevant. Accordingly, because there was no likelihood that Ligon was convicted of an offense other than § 846, the superseding indictment was not constructively amended.

## D. Sufficiency of the Evidence

Ligon argues that the government did not establish that there was sufficient evidence indicating that he was guilty of the charged conduct in Counts One and Two. We disagree and find that there was a sufficient amount of evidence to sustain the Count One and Count Two convictions.

Challenges pertaining to the sufficiency of the evidence supporting a criminal conviction are reviewed *de novo*. *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010). "[A] defendant claiming insufficiency of the evidence bears a heavy burden." *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998). Such claims must be evaluated "in the light most favorable to the government[,]" and we are required to "draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *Id.* (citation and quotation omitted). "In addressing sufficiency of the evidence questions, this Court has long recognized that we do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). "This court may conclude that a conviction is supported by sufficient evidence even though the circumstantial evidence does not remove every reasonable hypothesis except that of guilt." *Kuehne*, 547 F.3d at 696 (quoting *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996)).

Ligon filed a Rule 29 motion for acquittal, but only in regard to Count Two. Consequently, his failure to make a Rule 29 motion with respect to Count One constitutes a forfeiture of any objections to the sufficiency of the evidence as to that charge. *United States v. Damra*, 621 F.3d 474, 494 (6th Cir. 2010). "Where there has been a [forfeiture], we are limited in reviewing the sufficiency of evidence to determining whether there has been a 'manifest miscarriage of justice.'" *Id.* (quoting *Kuehne*, 547 F.3d at 697). We can find that there has been a "manifest miscarriage of justice" only if the "record is devoid of evidence pointing to guilt." *Kuehne*, 547 F.3d at 697 (quoting *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002)).

### 1. Existence of a Conspiracy (Count One)

Ligon argues that there was no evidence that he entered into a conspiracy with any other individual between February 22, 2019 and March 1, 2019, as is stated in the superseding indictment. "To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have demonstrated: (1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in that conspiracy." *United States v. Rosales*, 990 F.3d 989, 994 (6th Cir. 2021). "[P]roof of a formal agreement is not necessary; a tacit or material understanding among the parties will suffice." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)). Further, the "government may meet its burden of proof through circumstantial evidence." *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999).

Here, the evidence is sufficient to show that a reasonable jury could find that Ligon entered into a conspiracy to possess with the intent to distribute a mixture and substance containing fentanyl during the dates listed in the superseding indictment. The jury could have inferred that there was a tacit understanding between Ligon and the person communicating with him through the 440 number to engage in a conspiracy to possess with the intent to distribute fentanyl. Whoever had access to the 440 number monitored the shipping status of both parcels, and was apparently invested in, or at least curious about, when they arrived in Ohio. That same individual also called Ligon soon after he was supposed to secure the second parcel. Moreover, the jury could have taken into consideration that Ligon was undoubtedly involved in drug-dealing activities based on his interactions with Zazueta-Castro. Though the evidence is certainly circumstantial, Ligon did not suffer a manifest miscarriage of justice with regard to his Count One charge because when all of the evidence is considered together, the jury could have concluded that Ligon violated § 846.

*See United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) ("[D]irect evidence of the conspiracy is not necessary. It is enough to present circumstantial evidence which a reasonable person could interpret as showing participation in a common plan . . . . (internal quotation omitted)).

### 2. Attempt to Possess with Intent to Distribute Fentanyl (Count Two)

Ligon additionally contends that the government failed to present a sufficient amount of evidence proving that he attempted to possess with the intent to distribute fentanyl on February 22, 2019. "To convict a person of 'attempt' to commit a drug offense, the government must establish two essential elements: (1) the intent to engage in the proscribed criminal activity; and (2) the commission of an overt act which constitutes a substantial step towards commission of the proscribed criminal activity." *United States v. Argo*, 23 F. App'x 302, 306 (6th Cir. 2001) (citing *United States v. Pennyman*, 889 F.2d 104, 106 (6th Cir. 1989)). We have defined "substantial step" as "conduct strongly corroborative of the firmness of the defendant's criminal intent." *United States v. Burns*, 298 F.3d 523, 539 (6th Cir. 2002) (quoting *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999)).

Ligon argues only that the government has not proven that he took a substantial step towards engaging in conduct violative of § 841 and § 846. The record demonstrates that during January 2019, Ligon and Zazueta-Castro discussed a parcel containing fentanyl, which would be later delivered to Delano and was sent from Modesto, California. On February 22, 2019, a different package—that was discovered by the postal inspectors—was sent to Delano from Modesto, California, and contained fentanyl. We have held that "when a defendant engages in active negotiations to purchase drugs, he has committed the 'substantial step' towards the crime of possession required to convict him of attempted possession." *Bilderbeck*, 163 F.3d at 975. Thus, a rational trier of fact could have determined that the parcel delivered on February 22 was part of

ongoing and active drug-trafficking activities that were initiated between Ligon and Zazueta-Castro due to the similarities between both parcels. A rational trier of fact might have also considered that the 440 phone—that called and texted Ligon's phone—tracked the shipping status of the parcel delivered on February 22. Also, it would have been reasonable for a rational juror to take into consideration that the fentanyl pills retrieved from the package delivered on February 22 were the same size and color as the fentanyl pills—which the record demonstrates Ligon also attempted to possess with the intent to distribute—recovered from the parcel that was delivered only a few days later, on February 27. Accordingly, when the totality of the evidence is considered, our review of the record reveals that the government put forth sufficient—albeit circumstantial—evidence that could convince a rational trier of fact that Ligon was guilty of Count Two.

### E. Alleged Prejudicial Evidence

Ligon argues that it was error for the district court to allow the government to introduce evidence related to his arrest in West Virginia. He contends that his arrest in West Virginia was not relevant to the charges he faced and that evidence relating to that arrest should have been excluded because it was highly prejudicial.

We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Dunnican*, 961 F.3d 859, 873 (6th Cir. 2020). We will find that there has been an abuse of discretion if the district court "made 'errors of law or clear errors of factual determination.'" *United States v. Daneshvar*, 925 F.3d 766, 775 (6th Cir. 2019) (quoting *United States v. Baker*, 458 F.3d 513, 517 n.6 (6th Cir. 2006)). However, even if the district court abused its discretion, any evidentiary errors are subject to harmless error review. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). Pursuant to this rule, any "error, defect, irregularity, or variance that

does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a); *United States v. Meda*, 812 F.3d 502, 515 (6th Cir. 2015).

Under Federal Rule of Evidence 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). There are two exceptions to this general rule that are relevant to the issues raised on appeal. The first is that "intrinsic act" evidence, including "background" or "*res gestae*" evidence is admissible. *United States v. Sumlin*, 956 F.3d 879, 889–90 (6th Cir. 2020). Intrinsic acts are acts "that are inextricably intertwined with the criminal act charged or a part of the criminal activity as opposed to extrinsic acts, which are those that occurred at different times and under different circumstances from the offense charged." *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) (quoting *United States v. Stafford*, 198 F.3d 248, at *4 (6th Cir. 1999)). Proper background evidence "has a causal, temporal or spatial connection with the charged offense." *Sumlin*, 956 F.3d at 890 (quoting *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000)). The second exception to Rule 404(b) is that evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

At trial, the district court overruled Ligon's objection to the introduction of evidence of his West Virginia arrest. The court determined that the evidence was admissible as background evidence, finding that the acts were "inextricably intertwined with the defendant's involvement in a drug trafficking conspiracy and his continued attempted possession with the intent to distribute the fentanyl that was discovered in West Virginia." The court also stated that "[i]n the alternative, even if it were not to be res gestae, it would be admissible under 404(b) as intrinsic evidence to

show the defendant's knowledge, intent, identity, preparation, and planning, [and] certainly [to] demonstrate[] a lack of mistake or accident."

We agree with the district court's assessment as to the evidence being admissible as background evidence. The postal inspectors attempted to conduct a felony stop on Ligon's vehicle on March 1, 2019 because they believed he had engaged in dealing fentanyl pills. When Ligon was finally apprehended on April 11, 2019—only forty-one days later—West Virginia police officers recovered fentanyl pills that Ligon arguably had on his person and discarded while being chased by the police. The district court reasonably held that all of the evidence connected to Ligon's arrest in West Virginia was admissible because it showed that in April 2019, Ligon still, at the very least, engaged in possessing fentanyl pills—an element of his charged conduct in Counts One, Two, and Three—a little over a month after he was alleged to have participated in drug crimes in Ohio. The acts in West Virginia were inextricably intertwined with the acts in Ohio because they both demonstrated that Ligon was involved with a drug-trafficking conspiracy. Therefore, the evidence pertaining to the events in West Virginia was accurately admitted as background evidence. Accordingly, the Court need not address Ligon's contentions regarding whether the evidence was admissible pursuant to Rule 404(b). *Sumlin*, 956 F.3d at 891.

## F. Ineffective Assistance of Counsel

Ligon also claims that his trial counsel was ineffective for: (1) failure to sever Count Four from the other counts; (2) failure to object to the verdict forms and jury instructions; and (3) failure to object to his case being tried before an all-white jury. "Ineffective assistance of counsel claims are mixed questions of law and fact[,]" and we review them *de novo*. *United States v. Carter*, 355 F.3d 920, 924 (6th Cir. 2004). We typically refrain from addressing ineffective-assistance-of-counsel claims on direct appeal unless the existing record is "adequate to assess properly the

merits of the claim." *United States v. Hynes*, 467 F.3d 951, 969 (6th Cir. 2006) (quoting *United States v. Franklin*, 415 F.3d 537, 555–56 (6th Cir. 2005)). As we have explained, "a motion under 28 U.S.C. § 2255 is generally the preferred mode for raising a claim of ineffective assistance of counsel." *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012).

We find that the record is not sufficiently developed to support Ligon's ineffective-assistance-of-counsel contentions. With respect to each of Ligon's specific claims, for our Court to make an adequate assessment of trial counsel's representation of Ligon, we would need further information that would explain why counsel took, or failed to take, certain actions. This could be accomplished by way of trial counsel detailing his choices in an affidavit. Nevertheless, the evidence necessary for our Court to make determinations as to Ligon's claims is absent from the record. Furthermore, Ligon's claims are best litigated at the district court, "which is the forum best suited to developing the facts necessary to determining the adequacy of representation because it may take testimony from witnesses including the defendant, prosecution, and counsel." *Id.* (quoting *Massaro v. United States*, 538 U.S. 500, 505–06 (2003)) (internal quotation marks omitted). We therefore decline to review Ligon's ineffective-assistance-of-counsel claims.

## G. Procedural and Substantive Reasonableness

Ligon argues that his sentence was both procedurally and substantively unreasonable. Ligon claims that it was error for the district court to issue a post-sentence sentencing memorandum because it precluded him from raising objections to the court's findings made in its written order. He also alleges that the district court erred by imposing a sentence that was above the Guideline statutory minimum sentence. We find that neither of Ligon's claims have merit.

We apply a "deferential abuse-of-discretion standard" when reviewing a district court's sentencing determination. *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007) (quoting *Gall*

*v. United States*, 552 U.S. 38, 41 (2007)).  As for procedural reasonableness, a district court abuses its discretion if it

> commit[s] [a] significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.

*Gall*, 552 U.S. at 51.  "A claim that a sentence is substantively unreasonable is a claim that a sentence is too long (if a defendant appeals) or too short (if the government appeals)."  *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).  The substantive reasonableness analysis considers whether "the court placed too much weight on some of the [18 U.S.C.] § 3553(a) factors and too little on others in sentencing the individual."  *Id.*  Moreover, "[t]he fact that [we] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."  *Gall*, 552 U.S. at 51.

We construe Ligon's first claim as a procedural reasonableness argument because he is asserting that the district court failed to adequately explain its reasons for issuing its sentence.  Ligon implies that there were findings made by the court in its sentencing memorandum that the court did not address with Ligon at his sentencing hearing.  Ligon does not direct the Court to any findings made by the district court in its written opinion that he would have objected to at his sentencing hearing.  Further, Ligon does not point to any specific differences between the findings in the sentencing memorandum and the findings made by the court at his hearing.  Moreover, Ligon does not provide the Court with any supporting authority that stands for the proposition that a district court is prohibited from issuing a post-sentencing written order after adequately explaining on the record the reasons why the court was imposing a specific sentence.  Ligon's procedural reasonableness argument therefore fails.

Ligon's other contention, which we consider a substantive reasonableness argument, is that the district court's imposed 360-month sentence was unwarranted.

A sentence is substantively reasonable if it is "proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes" of the sentencing factors. *United States v. Vowell*, 516 F. 3d 503, 512 (6th Cir. 2008) (quoting *United States v. Smith*, 505 F.3d 463, 470 (6th Cir. 2007)) (internal quotation marks omitted). When considering substantive reasonableness, we take into account "the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S. 38 at 51. A sentence may be considered substantively unreasonable if "the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Sexton*, 889 F.3d 262, 265 (6th Cir. 2018) (quoting *United States v. Robinson*, 813 F.3d 251, 264 (6th Cir. 2016)). The district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party[,]" and "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 49–50.

Here, the district court sufficiently weighed the § 3553(a) factors and Ligon does not argue otherwise. The court discussed Ligon's extensive criminal history, and said that it had "rarely seen a criminal history so extensive and serious."[11] The court additionally assessed the nature and circumstances of Ligon's offenses, and explained that Ligon was "attributed with a total of 663.28 grams of the deadly opiate fentanyl throughout his course of conduct underlying the drug offenses." The court also considered the need to protect the public, finding that it needed to shield

---

[11] Ligon was previously convicted of multiple state and federal drug charges.

the public from Ligon because he was responsible for contributing to the persisting opioid epidemic. The court ultimately held that while the 360-month sentence was substantial, it was necessary to deter Ligon from continuing to participate in criminal activities involving drugs. Therefore, because the district court comprehensively balanced the § 3553(a) factors, we find that Ligon's sentence was not substantively unreasonable.

## III.

For the foregoing reasons, we AFFIRM the district court's judgment.